FIRST NATIONAL MAINTENANCE CORP. *v.*
NATIONAL LABOR RELATIONS BOARD

No. 80–544. Argued April 21, 1981—Decided June 22, 1981

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 688.

*Sanford E. Pollack* argued the cause for petitioner. With him on the briefs was *Perry S. Heidecker.*

*Norton J. Come* argued the cause for respondent. With him on the brief were *Solicitor General McCree, Elinor Hadley Stillman,* and *Linda Sher.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Must an employer, under its duty to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment," §§ 8 (d) and 8 (a)(5) of the National Labor Relations Act (Act), as amended, 49 Stat. 452, 29 U. S. C. §§ 158 (d) and 158 (a)(5), negotiate with the certified representative of its employees over its decision to close a part of its business? In this case, the National Labor Relations Board (Board) imposed such a duty on petitioner with re-

---

*Briefs of *amici curiae* urging reversal were filed by *Robert J. Fenlon* for the American Society for Personnel Administration; by *Marvin E. Frankel, Saul G. Kramer,* and *Stephen A. Bokat* for the Chamber of Commerce of the United States; and by *Daniel Popeo* and *Paul D. Kamenar* for the Washington Legal Foundation.

*J. Albert Woll, Laurence Gold, George Kaufmann,* and *John A. Fillion* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

spect to its decision to terminate a contract with a customer, and the United States Court of Appeals, although differing over the appropriate rationale, enforced its order.

## I

Petitioner, First National Maintenance Corporation (FNM), is a New York corporation engaged in the business of providing housekeeping, cleaning, maintenance, and related services for commercial customers in the New York City area. It supplies each of its customers, at the customer's premises, contracted-for labor force and supervision in return for reimbursement of its labor costs (gross salaries, FICA and FUTA taxes, and insurance) and payment of a set fee. It contracts for and hires personnel separately for each customer, and it does not transfer employees between locations.[1]

During the spring of 1977, petitioner was performing maintenance work for the Greenpark Care Center, a nursing home in Brooklyn. Its written agreement dated April 28, 1976, with Greenpark specified that Greenpark "shall furnish all tools, equiptment [sic], materials, and supplies," and would pay petitioner weekly "the sum of five hundred dollars plus the gross weekly payroll and fringe benefits." App. in No. 79–4167 (CA2), pp. 43, 44. Its weekly fee, however, had been reduced to $250 effective November 1, 1976. Id., at 46. The contract prohibited Greenpark from hiring any of petitioner's employees during the term of the contract and for 90 days thereafter. Id., at 44. Petitioner employed approximately 35 workers in its Greenpark operation.

Petitioner's business relationship with Greenpark, seem-

---

[1] The record does not show the precise dimension of petitioner's business. See 242 N. L. R. B. 462, 464 (1979). One of the owners testified that petitioner at that time had "between two and four" other nursing homes as customers. Ibid. The Administrative Law Judge hypothesized, however: "This is a large Company. For all I know, the 35 men at this particular home were only a small part of its total business in the New York area." Id., at 465.

ingly, was not very remunerative or smooth. In March 1977, Greenpark gave petitioner the 30 days' written notice of cancellation specified by the contract, because of "lack of efficiency." *Id.*, at 52. This cancellation did not become effective, for FNM's work continued after the expiration of that 30-day period. Petitioner, however, became aware that it was losing money at Greenpark. On June 30, by telephone, it asked that its weekly fee be restored at the $500 figure and, on July 6, it informed Greenpark in writing that it would discontinue its operations there on August 1 unless the increase were granted.[2] *Id.*, at 47. By telegram on July 25, petitioner gave final notice of termination. *Id.*, at 48.

While FNM was experiencing these difficulties, District 1199, National Union of Hospital and Health Care Employees, Retail, Wholesale and Department Store Union, AFL-CIO (union), was conducting an organization campaign among petitioner's Greenpark employees. On March 31, 1977, at a Board-conducted election, a majority of the employees selected the union as their bargaining agent.[3] On July 12, the union's vice president, Edward Wecker, wrote petitioner, notifying it of the certification and of the union's right to bargain, and stating: "We look forward to meeting with you or your representative for that purpose. Please advise when it will be convenient." *Id.*, at 49. Petitioner neither responded nor sought to consult with the union.

On July 28, petitioner notified its Greenpark employees that they would be discharged three days later. Wecker immediately telephoned petitioner's secretary-treasurer, Leonard Marsh, to request a delay for the purpose of bargaining. Marsh refused the offer to bargain and told Wecker that the termination of the Greenpark operation was purely a matter

---

[2] The record does not disclose how the contract's 30-day written notice provision was satisfied. In any event, the parties make no point of any shortage in the notice.

[3] The union was certified on May 11, 1977. App. in No. 79-4167 (CA2), p. 50.

of money, and final, and that the 30 days' notice provision of the Greenpark contract made staying on beyond August 1 prohibitively expensive. *Id.,* at 79–81, 83, 85–86, 94. Wecker discussed the matter with Greenpark's management that same day, but was unable to obtain a waiver of the notice provision. *Id.,* at 91–93, 98–99. Greenpark also was unwilling itself to hire the FNM employees because of the contract's 90-day limitation on hiring. *Id.,* at 100–101, 106–107. With nothing but perfunctory further discussion, petitioner on July 31 discontinued its Greenpark operation and discharged the employees. *Id.,* at 110–116.

The union filed an unfair labor practice charge against petitioner, alleging violations of the Act's §§ 8 (a)(1) and (5). After a hearing held upon the Regional Director's complaint, the Administrative Law Judge made findings in the union's favor. Relying on *Ozark Trailers, Inc.,* 161 N. L. R. B. 561 (1966), he ruled that petitioner had failed to satisfy its duty to bargain concerning both the decision to terminate the Greenpark contract and the effect of that change upon the unit employees.[4] The judge reasoned:

"That the discharge of a man is a change in his conditions of employment hardly needs comment. In these obvious facts, the law is clear. When an employer's work complement is represented by a union and he wishes to alter the hiring arrangements, be his reason lack of money or a mere desire to become richer, the law is no less clear that he must first talk to the union about it. . . . If Wecker had been given an opportunity to talk, something might have been worked out to transfer these people to other parts of [petitioner's] business. . . . Entirely apart from whether open discussion between the parties—with the Union speaking on behalf of the em-

---

[4] The Administrative Law Judge rejected petitioner's contention that it had satisfied, by that single phone call to Wecker, its duty to bargain about the termination.

ployees as was its right—might have persuaded [petitioner] to find a way of continuing this part of its operations, there was always the possibility that Marsh might have persuaded Greenpark to use these same employees to continue doing its maintenance work, either as direct employees or as later hires by a replacement contractor." 242 N. L. R. B. 462, 465 (1979).[5]

The Administrative Law Judge recommended an order requiring petitioner to bargain in good faith with the union about its decision to terminate its Greenpark service operation and its consequent discharge of the employees, as well as the effects of the termination. He recommended, also, that petitioner be ordered to pay the discharged employees backpay from the date of discharge until the parties bargained to agreement, or the bargaining reached an impasse, or the union failed timely to request bargaining, or the union failed to bargain in good faith.

The National Labor Relations Board adopted the Administrative Law Judge's findings without further analysis, and additionally required petitioner, if it agreed to resume its Greenpark operations, to offer the terminated employees reinstatement to their former jobs or substantial equivalents; conversely, if agreement was not reached, petitioner was

---

[5] The judge further found that petitioner's "regular and usual" method of operation involved "taking on, finishing, or discontinuing this or that particular job," 242 N. L. R. B., at 466, and that "[t]here was no capital involved when it decided to terminate the Greenpark job. The closing of this one spot in no sense altered the nature of its business, nor did it substantially affect its total size." *Ibid.* The Administrative Law Judge therefore found inapplicable the Board's ruling in *Brockway Motor Trucks, Division of Mack Trucks, Inc.*, 230 N. L. R. B. 1002, 1003 (1977), enf. denied, 582 F. 2d 720 (CA3 1978), that an employer's decision to close part of its business is not a mandatory subject of bargaining if it involves such a " 'significant investment or withdrawal of capital' as to 'affect the scope and ultimate direction of an enterprise,' " quoting from *General Motors Corp., GMC Truck & Coach Div.*, 191 N. L. R. B. 951, 952 (1971).

ordered to offer the employees equivalent positions, to be made available by discharge of subsequently hired employees, if necessary, at its other operations. *Id.*, at 463.

The United States Court of Appeals for the Second Circuit, with one judge dissenting in part, enforced the Board's order, although it adopted an analysis different from that espoused by the Board. 627 F. 2d 596 (1980).[6] The Court of Appeals reasoned that no *per se* rule could be formulated to govern an employer's decision to close part of its business. Rather, the court said, § 8 (d) creates a *presumption* in favor of mandatory bargaining over such a decision, a presumption that is rebuttable "by showing that the purposes of the statute would not be furthered by imposition of a duty to bargain," for example, by demonstrating that "bargaining over the decision would be futile," or that the decision was due to "emergency financial circumstances," or that the "custom of the industry, shown by the absence of such an obligation from typical collective bargaining agreements, is not to bargain over such decisions." *Id.*, at 601–602.

The Court of Appeals' decision in this case appears to be at odds with decisions of other Courts of Appeals,[7] some of which

---

[6] Because the court adopted different grounds for enforcement of the Board's order, it was error to enforce without a remand to the Board for further examination of the evidence and proper factfinding. *NLRB* v. *Pipefitters,* 429 U. S. 507, 522, n. 9 (1977); *SEC* v. *Chenery Corp.,* 318 U. S. 80, 95 (1943).

[7] The Court of Appeals in this case, for example, agreed, 627 F. 2d, at 601, with the Third Circuit in *Brockway Motor Trucks* v. *NLRB,* 582 F. 2d 720 (1978), that a presumption in favor of bargaining was to be established, but it analyzed differently how that presumption would be rebutted. The Third Circuit had decided that the competing interests of the employer and the employees, under the particular circumstances, must be weighed, and it had remanded the case before it to the Board for factfinding into the circumstances behind the partial closing. See also *Equitable Gas Co.* v. *NLRB,* 637 F. 2d 980 (CA3 1981) (subcontracting); *ABC Trans-National Transport, Inc.* v. *NLRB,* 642 F. 2d 675 (CA3 1981) (partial closing); *NLRB* v. *Royal Plating & Polishing Co.,* 350

decline to require bargaining over any management decision involving "a major commitment of capital investment" or a "basic operational change" in the scope or direction of an enterprise,[8] and some of which indicate that bargaining is not mandated unless a violation of § 8 (a)(3) (a partial closing motivated by antiunion animus) is involved.[9] The Court of Appeals for the Fifth Circuit has imposed a duty to bargain over partial closing decisions. See *NLRB* v. *Winn-Dixie Stores, Inc.*, 361 F. 2d 512, cert. denied, 385 U. S. 935 (1966). The Board itself has not been fully consistent in its rulings applicable to this type of management decision.[10]

F. 2d 191 (CA3 1965) (partial closing). Several courts have agreed with the Second Circuit. See, *e. g.*, *Davis* v. *NLRB*, 617 F. 2d 1264 (CA7 1980) (change of full-service restaurant to self-service cafeteria); *NLRB* v. *Production Molded Plastics, Inc.*, 604 F. 2d 451 (CA6 1979) (plant closing).

[8] See, *e. g.*, *NLRB* v. *International Harvester Co.*, 618 F. 2d 85 (CA9 1980); *NLRB* v. *Adams Dairy, Inc.*, 350 F. 2d 108 (CA8 1965), cert. denied, 382 U. S. 1011 (1966); *NLRB* v. *Transmarine Navigation Corp.*, 380 F. 2d 933 (CA9 1967); *Royal Typewriter Co.* v. *NLRB*, 533 F. 2d 1030 (CA8 1976); *NLRB* v. *Rapid Bindery, Inc.*, 293 F. 2d 170 (CA2 1961); *NLRB* v. *Thompson Transport Co.*, 406 F. 2d 698 (CA10 1969).

[9] See, *e. g.*, *Morrison Cafeterias Consolidated, Inc.* v. *NLRB*, 431 F. 2d 254 (CA8 1970); *NLRB* v. *Drapery Mfg. Co.*, 425 F. 2d 1026 (CA8 1970); *NLRB* v. *William J. Burns International Detective Agency, Inc.*, 346 F. 2d 897 (CA8 1965).

[10] Compare *National Car Rental System, Inc.*, 252 N. L. R. B. 159, 161 (1980) (employer's decision to terminate car leasing operations at one location not a mandatory subject because " 'essentially financial and managerial in nature,' involving a 'significant investment or withdrawal of capital, affecting the scope and ultimate direction of an enterprise,' " quoting from *General Motors Corp., GMC Truck & Coach Div.*, 191 N. L. R. B., at 952), and *Summit Tooling Co.*, 195 N. L. R. B. 479, 480 (1972) (decision to close a subsidiary not a mandatory subject because "its practical effect was to take the Respondent out of the business of manufacturing tool and tooling products"), with *Ozark Trailers, Inc.*, 161 N. L. R. B. 561, 567, 568 (1966) (employer's decision to shut down one of multiple plants was a mandatory subject because it was "a decision directly affecting terms and conditions of employment" and "interests of

Because of the importance of the issue and the continuing disagreement between and among the Board and the Courts of Appeals, we granted certiorari. 449 U. S. 1076 (1981).

## II

A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937). Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and channeling conflict between labor and management.[11] § 1 of the Act, as amended, 29 U. S. C. § 151. Congress ensured that collective bargaining would go forward by creating the Board and giving it the power to condemn as unfair labor practices certain conduct by unions and employers that it deemed deleterious to the process, including the refusal "to bargain collectively." §§ 3 and 8, 29 U. S. C. §§ 153 and 158.

Although parties are free to bargain about any legal subject, Congress has limited the mandate or duty to bargain to matters of "wages, hours, and other terms and conditions of employment." [12] A unilateral change as to a subject within

---

employees are of sufficient importance that their representatives ought to be consulted in matters affecting them"). See also *Kingwood Mining Co.,* 210 N. L. R. B. 844 (1974), aff'd *sub nom. United Mine Workers* v. *NLRB,* 169 U. S. App. D. C. 301, 515 F. 2d 1018 (1975).

[11] "Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances." *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S., at 42 (upholding the constitutionality of the Act).

[12] Sections 8 (a)(5) and 8 (b)(3) of the Act make it an unfair labor practice for an employer and union representative, respectively, "to refuse

this category violates the statutory duty to bargain and is subject to the Board's remedial order. *NLRB* v. *Katz,* 369 U. S. 736 (1962). Conversely, both employer and union may bargain to impasse over these matters and use the economic weapons at their disposal to attempt to secure their respective aims. *NLRB* v. *American National Ins. Co.,* 343 U. S. 395 (1952).[13] Congress deliberately left the words "wages, hours, and other terms and conditions of employment" without further definition, for it did not intend to deprive the Board of the power further to define those terms in light of specific industrial practices.[14]

---

to bargain collectively." 29 U. S. C. §§ 158 (a) (5) and 158 (b) (3). Section 8 (d), added, as was § 8 (b) (3), to the Act by the amendatory Labor Management Relations Act, 1947, 61 Stat. 136, defines the duty to bargain as

"the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U. S. C. § 158 (d).

Section 9 (a) further specifies that

"[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 29 U. S. C. § 159 (a).

[13] A matter that is not a mandatory subject of bargaining, unless it is illegal, may be raised at the bargaining table to be discussed in good faith, and the parties may incorporate it into an enforceable collective-bargaining agreement. Labor and management may not, however, insist on it to the point of impasse. *NLRB* v. *Borg-Warner Corp.,* 356 U. S. 342 (1958).

[14] In enacting the Labor Management Relations Act, 1947, Congress rejected a proposal in the House to limit the subjects of bargaining to

"(i) [w]age rates, hours of employment, and work requirements; (ii) procedures and practices relating to discharge, suspension, lay-off, recall, seniority, and discipline, or to promotion, demotion, transfer and assignment within the bargaining unit; (iii) conditions, procedures, and practices governing safety, sanitation, and protection of health at the place of employment; (iv) vacations and leaves of absence; and (v) adminis-

Nonetheless, in establishing what issues must be submitted to the process of bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed. Despite the deliberate open-endedness of the statutory language, there is an undeniable limit to the subjects about which bargaining must take place:

> "Section 8 (a) of the Act, of course, does not immutably fix a list of subjects for mandatory bargaining. . . . But it does establish a limitation against which proposed topics must be measured. In general terms, the limitation includes only issues that settle an aspect of the relationship between the employer and the employees." *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.,* 404 U. S. 157, 178 (1971).

See also *Ford Motor Co.* v. *NLRB,* 441 U. S. 488 (1979); *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U. S. 203 (1964); *Teamsters* v. *Oliver,* 358 U. S. 283 (1959).

Some management decisions, such as choice of advertising

---

trative and procedural provisions relating to the foregoing subjects." H. R. 3020 § 2 (11), 80th Cong., 1st Sess. (1947).

The adoption, instead, of the general phrase now part of § 8 (d) was clearly meant to preserve future interpretation by the Board. See H. R. Rep. No. 245, 80th Cong., 1st Sess., 71 (1947) (minority report) ("The appropriate scope of collective bargaining cannot be determined by a formula; it will inevitably depend upon the traditions of an industry, the social and political climate at any given time, the needs of employers and employees, and many related factors. What are proper subject matters for collective bargaining should be left in the first instance to employers and trade-unions, and in the second place, to any administrative agency skilled in the field and competent to devote the necessary time to a study of industrial practices and traditions in each industry or area of the country, subject to review by the courts. It cannot and should not be strait-jacketed by legislative enactment"); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 34–35 (1947). Specific references in the legislative history to plant closings, however, are inconclusive. See 79 Cong. Rec. 7673, 9682 (1935) (comments of Sen. Walsh and Rep. Griswold).

and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship. See *Fibreboard*, 379 U. S., at 223 (STEWART, J., concurring). Other management decisions, such as the order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively "an aspect of the relationship" between employer and employee. *Chemical Workers*, 404 U. S., at 178. The present case concerns a third type of management decision, one that had a direct impact on employment, since jobs were inexorably eliminated by the termination, but had as its focus only the economic profitability of the contract with Greenpark, a concern under these facts wholly apart from the employment relationship. This decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, "not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment." *Fibreboard*, 379 U. S., at 223 (STEWART, J., concurring). Cf. *Textile Workers* v. *Darlington Co.*, 380 U. S. 263, 268 (1965) ("an employer has the absolute right to terminate his entire business for any reason he pleases"). At the same time, this decision touches on a matter of central and pressing concern to the union and its member employees: the possibility of continued employment and the retention of the employees' very jobs. See *Brockway Motor Trucks* v. *NLRB*, 582 F. 2d 720, 735–736 (CA3 1978); *Ozark Trailers, Inc.*, 161 N. L. R. B. 561, 566–568 (1966).

Petitioner contends it had no duty to bargain about its decision to terminate its operations at Greenpark. This contention requires that we determine whether the decision itself should be considered part of petitioner's retained freedom to manage its affairs unrelated to employment.[15] The aim of

---

[15] There is no doubt that petitioner was under a duty to bargain about the results or effects of its decision to stop the work at Greenpark, or

labeling a matter a mandatory subject of bargaining, rather than simply permitting, but not requiring, bargaining, is to "promote the fundamental purpose of the Act by bringing a problem of vital concern to labor and management within the framework established by Congress as most conducive to industrial peace," *Fibreboard*, 379 U. S., at 211. The concept of mandatory bargaining is premised on the belief that collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole.[16] *Ford Motor Co.*, 441 U. S., at 500–501; *Borg-Warner*, 356 U. S., at 350 (condemning employer's proposal of "ballot" clause as weakening the collective-bargaining process). This will be true, however, only if the subject proposed for discussion is amenable to resolution through the bargaining process. Management must be free from the constraints of the bargaining process[17]

---

that it violated that duty. Petitioner consented to enforcement of the Board's order concerning bargaining over the effects of the closing and has reached agreement with the union on severance pay. App. in No. 79–4167 (CA2), pp. 21–22.

[16] "The Act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' . . . The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel." *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S., at 45. Cf. *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 549 (1964) ("The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship").

[17] The employer has no obligation to abandon its intentions or to agree with union proposals. On proper subjects, it must meet with the union, provide information necessary to the union's understanding of the prob-

to the extent essential for the running of a profitable business. It also must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice. Congress did not explicitly state what issues of mutual concern to union and management it intended to exclude from mandatory bargaining.[18]   Nonetheless, in view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.

The Court in *Fibreboard* implicitly engaged in this analysis with regard to a decision to subcontract for maintenance work previously done by unit employees.   Holding the employer's decision a subject of mandatory bargaining, the Court relied not only on the "literal meaning" of the statutory words, but also reasoned:

> "The Company's decision to contract out the maintenance work did not alter the Company's basic operation.   The maintenance work still had to be performed in the plant.

---

lem, and in good faith consider any proposals the union advances.   In concluding to reject a union's position as to a mandatory subject, however, it must face the union's possible use of strike power.   See generally Fleming, The Obligation to Bargain in Good Faith, 47 Va. L. Rev. 988 (1961).

[18] The subjects over which mandatory bargaining has been required have changed over time.   Employers and unions have been required to bargain over such diverse topics as profit-sharing plans, *Winn-Dixie Stores, Inc.* v. *NLRB,* 567 F. 2d 1343 (CA5), cert. denied, 439 U. S. 985 (1978); layoffs and recalls, see *Awrey Bakeries, Inc.* v. *NLRB,* 548 F. 2d 138 (CA6 1976); contractual clauses concerning race discrimination, see *Wichita Eagle & Beacon Publishing Co.,* 222 N. L. R. B. 742 (1976); and "most favored nation" clauses, *Dolly Madison Industries, Inc.,* 182 N. L. R. B. 1037 (1970).   See also *Borg-Warner,* 356 U. S., at 353 (Harlan, J., concurring in part and dissenting in part).

No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." 379 U. S., at 213.

The Court also emphasized that a desire to reduce labor costs, which it considered a matter "peculiarly suitable for resolution within the collective bargaining framework," *id.*, at 214, was at the base of the employer's decision to subcontract:

"It was induced to contract out the work by assurances from independent contractors that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework, and industrial experience demonstrates that collective negotiation has been highly successful in achieving peaceful accommodation of the conflicting interests." *Id.*, at 213–214.

The prevalence of bargaining over "contracting out" as a matter of industrial practice generally was taken as further proof of the "amenability of such subjects to the collective bargaining process." *Id.*, at 211.

With this approach in mind, we turn to the specific issue at hand: an economically motivated decision to shut down part of a business.

## III

### A

Both union and management regard control of the decision to shut down an operation with the utmost seriousness. As has been noted, however, the Act is not intended to serve either party's individual interest, but to foster in a neutral

manner a system in which the conflict between these interests may be resolved. It seems particularly important, therefore, to consider whether requiring bargaining over this sort of decision will advance the neutral purposes of the Act.

A union's interest in participating in the decision to close a particular facility or part of an employer's operations springs from its legitimate concern over job security. The Court has observed: "The words of [§ 8 (d)] . . . plainly cover termination of employment which . . . necessarily results" from closing an operation. *Fibreboard,* 379 U. S., at 210. The union's practical purpose in participating, however, will be largely uniform: it will seek to delay or halt the closing. No doubt it will be impelled, in seeking these ends, to offer concessions, information, and alternatives that might be helpful to management or forestall or prevent the termination of jobs.[19] It is unlikely, however, that requiring bargaining over the decision itself, as well as its effects, will augment this flow of information and suggestions. There is no dispute that the union must be given a significant opportunity to bargain about these matters of job security as part of the "effects" bargaining mandated by § 8 (a)(5). See, *e. g., NLRB* v. *Royal Plating & Polishing Co.,* 350 F. 2d 191, 196 (CA3 1965); *NLRB* v. *Adams Dairy, Inc.,* 350 F. 2d 108 (CA8 1965), cert. denied, 382 U. S. 1011 (1966). And, under § 8 (a)(5), bar-

---

[19] We are aware of past instances where unions have aided employers in saving failing businesses by lending technical assistance, reducing wages and benefits or increasing production, and even loaning part of earned wages to forestall closures. See S. Slichter, J. Healy, & E. Livernash, The Impact of Collective Bargaining on Management 845–851 (1960); C. Golden & H. Rutenberg, The Dynamics of Industrial Democracy 263–291 (1942). See also *United Steel Workers of America, Local No. 1330,* v. *United States Steel Corp.,* 492 F. Supp. 1 (ND Ohio), aff'd in part and vacated in part, 631 F. 2d 1264 (CA6 1980) (union sought to purchase failing plant); 104 LRR 239 (1980) (employee ownership plan instituted to save company); *id.,* at 267–268 (union accepted pay cuts to reduce plant's financial problems). These have come about without the intervention of the Board enforcing a statutory requirement to bargain.

gaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy. A union, by pursuing such bargaining rights, may achieve valuable concessions from an employer engaged in a partial closing. It also may secure in contract negotiations provisions implementing rights to notice, information, and fair bargaining. See BNA, Basic Patterns in Union Contracts 62–64 (9th ed., 1979).

Moreover, the union's legitimate interest in fair dealing is protected by § 8 (a)(3), which prohibits partial closings motivated by antiunion animus, when done to gain an unfair advantage. *Textile Workers* v. *Darlington Co.*, 380 U. S. 263 (1965). Under § 8 (a)(3) the Board may inquire into the motivations behind a partial closing. An employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision "purely economic."

Thus, although the union has a natural concern that a partial closing decision not be hastily or unnecessarily entered into, it has some control over the effects of the decision and indirectly may ensure that the decision itself is deliberately considered. It also has direct protection against a partial closing decision that is motivated by an intent to harm a union.

Management's interest in whether it should discuss a decision of this kind is much more complex and varies with the particular circumstances. If labor costs are an important factor in a failing operation and the decision to close, management will have an incentive to confer voluntarily with the union to seek concessions that may make continuing the business profitable. Cf. U. S. News & World Report, Feb. 9, 1981, p. 74; BNA, Labor Relations Yearbook–1979, p. 5 (UAW agreement with Chrysler Corp. to make concessions on wages and fringe benefits). At other times, management may have great need for speed, flexibility, and secrecy in

meeting business opportunities and exigencies.[20]   It may face significant tax or securities consequences that hinge on confidentiality, the timing of a plant closing, or a reorganization of the corporate structure.   The publicity incident to the normal process of bargaining may injure the possibility of a successful transition or increase the economic damage to the business.   The employer also may have no feasible alternative to the closing, and even good-faith bargaining over it may both be futile and cause the employer additional loss.[21]

There is an important difference, also, between permitted bargaining and mandated bargaining.   Labeling this type of decision mandatory could afford a union a powerful tool for achieving delay, a power that might be used to thwart management's intentions in a manner unrelated to any feasible solution the union might propose.   See Comment, "Partial Terminations"—A Choice Between Bargaining Equality and Economic Efficiency, 14 UCLA L. Rev. 1089, 1103–1105 (1967).   In addition, many of the cases before the Board have involved, as this one did, not simply a refusal to bargain over the decision, but a refusal to bargain at all, often coupled with other unfair labor practices.   See, e. g., *Electrical Products Div. of Midland-Ross Corp.* v. *NLRB,* 617 F. 2d 977 (CA3 1980), cert. denied, 449 U. S. 871 (1981); *NLRB* v. *Amoco Chemicals Corp.,* 529 F. 2d 427 (CA5 1976); *Royal Typewriter Co.* v. *NLRB,* 533 F. 2d 1030 (CA8 1976); *NLRB*

---

[20] See *International Assn. of Machinists & Aerospace Workers* v. *Northeast Airlines, Inc.,* 473 F. 2d 549, 556–557 (CA1), cert. denied, 409 U. S. 845 (1972); *Raskin Packing Co.,* 246 N. L. R. B. No. 15 (1979); *M&M Transportation Co.,* 239 N. L. R. B. 73 (1978); Goetz, The Duty to Bargain About Changes in Operations, 1964 Duke L. J. 1, 9–10. Cf. *Detroit Edison Co.* v. *NLRB,* 440 U. S. 301, 316 (1979) (noting the "danger of inadvertent leaks" in giving union confidential information).

[21] See *ABC Trans-National Transport, Inc.* v. *NLRB,* 642 F. 2d 675 (CA3 1981); Loomis & Herman, Management's Reserved Rights and the NLRB—An Employer's View, 19 Lab. L. J. 695 (1968); Comment, "Partial Terminations"—A Choice Between Bargaining Equality and Economic Efficiency, 14 UCLA L. Rev. 1089 (1967).

v. *American Mfg. Co.*, 351 F. 2d 74 (CA5 1965) (subcontracting); *Smyth Mfg. Co.*, 247 N. L. R. B. 1139 (1980). In these cases, the employer's action gave the Board reason to order remedial relief apart from access to the decisionmaking process. It is not clear that a union would be equally dissatisfied if an employer performed all its bargaining obligations apart from the additional remedy sought here.

While evidence of current labor practice is only an indication of what is feasible through collective bargaining, and not a binding guide, see *Chemical Workers*, 404 U. S., at 176, that evidence supports the apparent imbalance weighing against mandatory bargaining. We note that provisions giving unions a right to participate in the decisionmaking process concerning alteration of the scope of an enterprise appear to be relatively rare. Provisions concerning notice and "effects" bargaining are more prevalent. See II BNA, Collective Bargaining Negotiations and Contracts § 65:201–233 (1981); U. S. Dept. of Labor, Bureau of Labor Statistics, Bull. 2065, Characteristics of Major Collective Bargaining Agreements, Jan. 1, 1978, pp. 96, 100, 101, 102–103 (1980) (charting provisions giving interplant transfer and relocation allowances; advance notice of layoffs, shutdowns, and technological changes; and wage-employment guarantees; no separate tables on decision-bargaining, presumably due to rarity). See also U. S. Dept. of Labor, Bureau of Labor Statistics, Bull. No. 1425–10, Major Collective Bargaining Agreements, Plant Movement, Transfer, and Relocation Allowances (July 1969).

Further, the presumption analysis adopted by the Court of Appeals seems ill-suited to advance harmonious relations between employer and employee. An employer would have difficulty determining beforehand whether it was faced with a situation requiring bargaining or one that involved economic necessity sufficiently compelling to obviate the duty to bargain. If it should decide to risk not bargaining, it might be faced ultimately with harsh remedies forcing it to pay large amounts of backpay to employees who likely would have been

discharged regardless of bargaining, or even to consider reopening a failing operation. See, *e. g., Electrical Products Div. of Midland-Ross Corp.,* 239 N. L. R. B. 323 (1978), enf'd, 617 F. 2d 977 (CA3 1980), cert. denied, 449 U. S. 871 (1981). Cf. *Lever Brothers Co.* v. *International Chemical Workers Union,* 554 F. 2d 115 (CA4 1976) (enjoining plant closure and transfer to permit negotiations). Also, labor costs may not be a crucial circumstance in a particular economically based partial termination. See, *e. g., NLRB* v. *International Harvester Co.,* 618 F. 2d 85 (CA9 1980) (change in marketing structure); *NLRB* v. *Thompson Transport Co.,* 406 F. 2d 698 (CA10 1969) (loss of major customer). And in those cases, the Board's traditional remedies may well be futile. See *ABC Trans-National Transport, Inc.* v. *NLRB,* 642 F. 2d 675 (CA3 1981) (although employer violated its "duty" to bargain about freight terminal closing, court refused to enforce order to bargain). If the employer intended to try to fulfill a court's direction to bargain, it would have difficulty determining exactly at what stage of its deliberations the duty to bargain would arise and what amount of bargaining would suffice before it could implement its decision. Compare *Burns Ford, Inc.,* 182 N. L. R. B. 753 (1970) (one week's notice of layoffs sufficient), and *Hartmann Luggage Co.,* 145 N. L. R. B. 1572 (1964) (entering into executory subcontracting agreement before notifying union not a violation since contract not yet final), with *Royal Plating & Polishing Co.,* 148 N. L. R. B. 545, 555 (1964), enf. denied, 350 F. 2d 191 (CA3 1965) (two weeks' notice before final closing of plant inadequate). If an employer engaged in some discussion, but did not yield to the union's demands, the Board might conclude that the employer had engaged in "surface bargaining," a violation of its good faith. See *NLRB* v. *Reed & Prince Mfg. Co.,* 205 F. 2d 131 (CA1), cert. denied, 346 U. S. 887 (1953). A union, too, would have difficulty determining the limits of its prerogatives, whether and when it could use its economic powers to try to alter an employer's

decision, or whether, in doing so, it would trigger sanctions from the Board. See, *e. g., International Offset Corp.,* 210 N. L. R. B. 854 (1974) (union's failure to realize that shutdown was imminent, in view of successive advertisements, sales of equipment, and layoffs, held a waiver of right to bargain); *Shell Oil Co.,* 149 N. L. R. B. 305 (1964) (union waived its right to bargain by failing to request meetings when employer announced intent to transfer a few days before implementation).

We conclude that the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision,[22] and we hold that the decision itself is *not* part of § 8 (d)'s "terms and conditions," see n. 12, *supra,* over which Congress has mandated bargaining.[23]

---

[22] In this opinion we of course intimate no view as to other types of management decisions, such as plant relocations, sales, other kinds of subcontracting, automation, etc., which are to be considered on their particular facts. See, *e. g., International Ladies' Garment Workers Union* v. *NLRB,* 150 U. S. App. D. C. 71, 463 F. 2d 907 (1972) (plant relocation predominantly due to labor costs); *Weltronic Co.* v. *NLRB,* 419 F. 2d 1120 (CA6 1969) (decision to move plant three miles), cert. denied, 398 U. S. 938 (1970); *Dan Dee West Virginia Corp.,* 180 N. L. R. B. 534 (1970) (decision to change method of distribution, under which employee-drivers became independent contractors); *Young Motor Truck Service, Inc.,* 156 N. L. R. B. 661 (1966) (decision to sell major portion of business). See also Schwarz, Plant Relocation or Partial Termination—The Duty to Decision-Bargain, 39 Ford. L. Rev. 81, 100–102 (1970).

[23] Despite the contentions of *amicus* AFL–CIO our decision in *Railroad Telegraphers* v. *Chicago & N. W. R. Co.,* 362 U. S. 330 (1960), does not require that we find bargaining over this partial closing decision mandatory. In that case, a union certified as bargaining agent for certain railroad employees requested that the railroad bargain over its decision to close down certain stations thereby eliminating a number of jobs. When the union threatened to strike over the railroad's refusal to bargain on this issue, the railroad sought an injunction in federal court. Construing

## B

In order to illustrate the limits of our holding, we turn again to the specific facts of this case. First, we note that when petitioner decided to terminate its Greenpark contract, it had no intention to replace the discharged employees or to move that operation elsewhere. Petitioner's sole purpose was to reduce its economic loss, and the union made no claim of antiunion animus. In addition, petitioner's dispute with Greenpark was solely over the size of the management fee Greenpark was willing to pay. The union had no control or authority over that fee. The most that the union could

the scope of bargaining required by § 2, First, of the Railway Labor Act, 45 U. S. C. § 152, First, the Court held that the union's effort to negotiate was not "an unlawful bargaining demand," 362 U. S., at 341, and that the District Court was precluded from enjoining the threatened strike by § 4 of the Norris-LaGuardia Act, 29 U. S. C. § 104, which deprives federal courts of "jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from . . . [c]easing or refusing to perform any work. . . ." Although the Court in part relied on an expansive interpretation of § 2, First, which requires railroads to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions," and § 13 (c) of the Norris-LaGuardia Act, 29 U. S. C. § 113 (c), defining "labor dispute" as "any controversy concerning terms or conditions of employment," its decision also rested on the particular aims of the Railway Labor Act and national transportation policy. See 362 U. S., at 336–338. The mandatory scope of bargaining under the Railway Labor Act and the extent of the prohibition against injunctive relief contained in Norris-LaGuardia are not coextensive with the National Labor Relations Act and the Board's jurisdiction over unfair labor practices. See *Chicago & N. W. R. Co.* v. *Transportation Union,* 402 U. S. 570, 579, n. 11 (1971) ("parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes"). Cf. *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235 (1970); *Buffalo Forge Co.* v. *Steelworkers,* 428 U. S. 397 (1976).

have offered would have been advice and concessions that Greenpark, the third party upon whom rested the success or failure of the contract, had no duty even to consider. These facts in particular distinguish this case from the subcontracting issue presented in *Fibreboard*. Further, the union was not selected as the bargaining representative or certified until well after petitioner's economic difficulties at Greenpark had begun. We thus are not faced with an employer's abrogation of ongoing negotiations or an existing bargaining agreement. Finally, while petitioner's business enterprise did not involve the investment of large amounts of capital in single locations, we do not believe that the absence of "significant investment or withdrawal of capital," *General Motors Corp., GMC Truck & Coach Div.*, 191 N. L. R. B., at 952, is crucial. The decision to halt work at this specific location represented a significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely.

The judgment of the Court of Appeals, accordingly, is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Section 8 (d) of the National Labor Relations Act, as amended, requires employers and employee representatives "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U. S. C. § 158 (d). The question in this case is whether First National Maintenance Corporation's decision to terminate its Greenpark Care Center operation and to discharge the workers employed in that operation was a decision with respect to "terms and conditions of employment" within the meaning of the Act, thus rendering its failure to negotiate with the union unlawful.

As this Court has noted, the words "terms and conditions of employment" plainly cover termination of employment resulting from a management decision to close an operation. *Fibreboard Paper Products Corp.* v. *NLRB,* 379 U. S. 203, 210 (1964). As the Court today admits, the decision to close an operation "touches on a matter of central and pressing concern to the union and its member employees." *Ante,* at 677. Moreover, as the Court today further concedes, Congress deliberately left the words "terms and conditions of employment" indefinite, so that the NLRB would be able to give content to those terms in light of changing industrial conditions. *Ante,* at 675, and n. 14. In the exercise of its congressionally delegated authority and accumulated expertise, the Board has determined that an employer's decision to close part of its operations affects the "terms and conditions of employment" within the meaning of the Act, and is thus a mandatory subject for collective bargaining. *Ozark Trailers, Inc.,* 161 N. L. R. B. 561 (1966). Nonetheless, the Court today declines to defer to the Board's decision on this sensitive question of industrial relations, and on the basis of pure speculation reverses the judgment of the Board and of the Court of Appeals. I respectfully dissent.

The Court bases its decision on a balancing test. It states that "bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *Ante,* at 679. I cannot agree with this test, because it takes into account only the interests of *management;* it fails to consider the legitimate employment interests of the workers and their union. Cf. *Brockway Motor Trucks* v. *NLRB,* 582 F. 2d 720, 734–740 (CA3 1978) (balancing of interests of workers in retaining their jobs against interests of employers in maintaining unhindered control over corporate direction). This one-sided approach hardly serves "to foster in a neutral man-

ner" a system for resolution of these serious, two-sided controversies. See *ante,* at 680–681.

Even if the Court's statement of the test were accurate, I could not join in its application, which is based solely on speculation. Apparently, the Court concludes that the benefit to labor-management relations and the collective-bargaining process from negotiation over partial closings is minimal, but it provides no evidence to that effect. The Court acknowledges that the union might be able to offer concessions, information, and alternatives that might obviate or forestall the closing, but it then asserts that "[i]t is unlikely, however, that requiring bargaining over the decision . . . will augment this flow of information and suggestions." *Ante,* at 681. Recent experience, however, suggests the contrary. Most conspicuous, perhaps, were the negotiations between Chrysler Corporation and the United Auto Workers, which led to significant adjustments in compensation and benefits, contributing to Chrysler's ability to remain afloat. See Wall Street Journal, Oct. 26, 1979, p. 3, col. 1. Even where labor costs are not the direct cause of a company's financial difficulties, employee concessions can often enable the company to continue in operation—if the employees have the opportunity to offer such concessions.*

The Court further presumes that management's need for "speed, flexibility, and secrecy" in making partial closing decisions would be frustrated by a requirement to bargain. *Ante,* at 682–683. In some cases the Court might be correct. In others, however, the decision will be made openly and de-

---

*Indeed, in this case, the Court of Appeals found: "On the record, . . . there is sufficient reason to believe that, given the opportunity, the union might have made concessions, by accepting reduction in wages or benefits (take-backs) or a reduction in the work force, which would in part or in whole have enabled Greenpark to give FNM an increased management fee. At least, if FNM had bargained over its decision to close, that possibility would have been tested, and management would still have been free to close the Greenpark operation if bargaining did not produce a solution." 627 F. 2d 596, 602 (CA2 1980).

liberately, and considerations of "speed, flexibility, and secrecy" will be inapposite. Indeed, in view of management's admitted duty to bargain over the effects of a closing, see *ante,* at 677–678, n. 15, it is difficult to understand why additional bargaining over the closing itself would necessarily unduly delay or publicize the decision.

I am not in a position to judge whether mandatory bargaining over partial closings *in all cases* is consistent with our national labor policy, and neither is the Court. The primary responsibility to determine the scope of the statutory duty to bargain has been entrusted to the NLRB, which should not be reversed by the courts merely because they might prefer another view of the statute. *Ford Motor Co.* v. *NLRB,* 441 U. S. 488, 495–497 (1979); see *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236 (1963). I therefore agree with the Court of Appeals that employers presumptively have a duty to bargain over a decision to close an operation, and that this presumption can be rebutted by a showing that bargaining would be futile, that the closing was due to emergency financial circumstances, or that, for some other reason, bargaining would not further the purposes of the National Labor Relations Act. 627 F. 2d 596, 601 (CA2 1980). I believe that this approach is amply supported by recent decisions of the Board. *E. g., Brooks-Scanlon, Inc.,* 246 N. L. R. B. 476, 102 LRRM 1606 (1979); *Raskin Packing Co.,* 246 N. L. R. B. 78, 102 LRRM 1489 (1979); *M. & M. Transportation Co.,* 239 N. L. R. B. 73 (1978). With respect to the individual facts of this case, however, I would vacate the judgment of the Court of Appeals, and remand to the Board for further examination of the evidence. See *SEC* v. *Chenery Corp.,* 318 U. S. 80, 94–95 (1943).