INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, and its Local 449, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

National Lock Corporation, et al., Intervening Respondents.

No. 85–2857.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1986.

Decided Oct. 3, 1986.

Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., for petitioners.

Lawrence Blatnik, N.L.R.B., Washington, D.C., Ray J. Schoonhoven, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

The United Automobile Workers ask us to vacate a decision by the National Labor Relations Board dismissing the union's charge that National Lock Corporation refused to bargain in good faith over the movement of operations at one of its plants to another state, in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). The Board held that the union had waived any statutory right it might have had to bargain over the move. *National Metalcrafters, Inc.*, 276 N.L.R.B. No. 14 (Aug. 27, 1985).

---

* Hon. William J. Campbell, of the Northern District of Illinois, sitting by designation.

Workers represented by the union made locks and other hardware at the company's plant in Rockford, Illinois. Section 1.1(b) of the collective bargaining agreement provided that "in the event the Company contemplates the relocation of any of its operations conducted at its present divisions in Rockford, Illinois, the Company agrees to discuss such relocation in advance and to negotiate with the Union concerning the effect of such relocation on employees." Faced with high production (including labor) costs in Rockford, and unable to obtain wage concessions from the union, the company decided to move some of its manufacturing to Mauldin, South Carolina, with the result that hundreds of workers lost their jobs. The company told the union about the impending move but did not bargain over it; hence the unfair labor practice charge. The company did bargain over the effects of the move on the workers, for it concedes that the word "negotiate" in the last part of section 1.1(b) means bargain. But it would not bargain over whether to relocate.

At the hearing before the administrative law judge on the union's unfair labor practice charge, oral testimony was taken on the background and purpose of section 1.1(b). The union's witnesses testified that it had been included in order to make sure that the union would have first crack at organizing the workers at the new plant; in a previous relocation by the company, the union had lost out to a rival union in the race to organize them. The union's witnesses denied there had been any discussion of waiving the union's statutory right to bargain over plant relocations. In contrast, Carter, who had negotiated the contract for the company and had drafted section 1.1(b), testified that in the negotiations he had told the union that the company would not agree to any restriction on its right to relocate work, and that the word "discuss" had been used advisedly, and meant "notify" rather than "negotiate" or "bargain." The company also pointed out that in previous cases of relocation the union had not asserted any right to bargain. But the union countered that those

relocations had not resulted in a loss of jobs at the Rockford plant; the workers made surplus by the move had been given other jobs there.

The administrative law judge, saying he disbelieved Carter's testimony and believed that of the union's witnesses, concluded that the word "discuss" had not been intended as a waiver of the union's statutory right to bargain over a relocation motivated by wage concerns; hence the company had committed an unfair labor practice. The Board reversed. While upholding all of the findings on credibility that the administrative law judge had made, the Board held that the bargaining history (presumably the union's failure to have requested bargaining over the previous relocations), in conjunction with the "plain meaning" of the word "discuss" when juxtaposed with "negotiate" in section 1.1(b), demonstrated that the union had waived the right to bargain.

The administrative law judge's opinion contains a number of errors and omissions, and his credibility findings are suspect because based in part on the union's having produced several witnesses to the negotiation of section 1.1(b) and the company only one, Carter; no other significance can be attached to the administrative law judge's disparaging reference to the lack of "corroboration" for Carter's testimony. So this is not a case where a strong initial decision opposite to the Board's decision requires us to consider the evidentiary and analytical basis of the Board's decision with special care. See, e.g., *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed.2d 456 (1951); *Mattes v. United States*, 721 F.2d 1125, 1129 (7th Cir.1983). Nor is the conclusion that the Board reached an unreasonable one. A natural reading of section 1.1(b) is that the company agrees merely to discuss with the union in advance, but does not agree to bargain over—in the technical sense in which the word "bargain" is used in the National Labor Relations Act, see 29 U.S.C. § 158(a)(5); *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)—any

contemplated relocation of operations. All that the company agrees to bargain over (the parties equate "negotiate" in section 1.1(b) to "bargain" in the technical sense) is what to do with the workers made redundant by the relocation. Although section 1.1(b) is found in the article of the collective bargaining agreement that deals with recognition of the union rather than with bargaining, the title of the article, "Recognition, Union Security, and Checkoff," is boilerplate. The article may just have been a convenient parking place for a section actually designed to regulate comprehensively and exhaustively the moving of operations from one plant to another.

The Board's opinion, however, is perfunctory, incomplete, and inconsistent. The Board has the unfortunate habit of writing opinions in the form of commentaries (usually in footnotes, though here there was text as well) on the administrative law judge's always much longer and more comprehensive opinion. Maybe the Board's workload is too heavy to allow anything better but that will not permit us to uphold a decision for which the Board has failed to provide a coherent rationale. See, e.g., *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 853–54, 85 L.Ed. 1271 (1941); Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 206–09.

The basic flaws in the Board's analysis are three:

■ 1. Its opinion leaps illogically from the proposition that the "plain meaning" of "discuss" is not "bargain" to the conclusion that the union waived its statutory right to bargain over plant relocations. Overlooked is the possibility that the "discuss" clause has a different domain from the statutory right and can coexist with it. The Supreme Court has not yet decided whether and in what circumstances a company must bargain with a union over the decision to relocate operations. See *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 686 n. 22, 101 S.Ct. 2573, 2584–85 n. 22, 69 L.Ed.2d 318 (1981), and the inter-

esting commentary on the decision in Alchian, *Decision Sharing and Expropriable Specific Quasi-Rents: A Theory of First National Maintenance Corporation v. NLRB*, 1 Sup.Ct.Econ.Rev. 235 (1982). But the lower federal courts and the Labor Board hold, and we do not understand National Lock Corporation to contest, that a company must bargain if the decision to relocate is significantly motivated by concern over labor costs, though not (and this the union does not contest) if it is based mainly on factors other than labor, such as a desire to economize on shipping costs. See, e.g., *Otis Elevator Co.*, 269 N.L.R.B. 891 (1984). Even if the present case were of the second rather than first type, so that the union had no statutory right to demand that the company bargain over the decision to relocate, the union might be eager to know about the relocation in advance so that it could sign up the workers at the new plant ahead of any other union. It thus might want the company to agree to "discuss" (not bargain over) *all* relocations in advance, including those not covered by the statutory right to bargain. For presumably a contractual duty to discuss would entitle the union to obtain specific information—say about the work force at the new plant—that would give it an organizing edge over rival unions.

In exchange for this right of notice the union may or may not have given up its statutory right to bargain—a stronger right, but applicable to fewer relocations, and perhaps therefore on balance less valuable to the union. But one cannot just assume, as the Board did, that because section 1.1(b) is about relocations and does not create a duty to bargain (except over the effects of the relocation—and the difference between "decision" bargaining and "effects" bargaining is well recognized, see, e.g., *First Nat'l Maintenance Corp. v. NLRB, supra*, 452 U.S. at 677 n. 15, 681–82, 101 S.Ct. at 2580 n. 15, 2582), the section supplants the statutory right to bargain over a relocation decision based at least in part on labor costs. Someone who believed the testimony of the union's wit-

nesses would probably conclude that the union had not waived its statutory right. That testimony indicates that the negotiations over the "discuss" clause were limited to the matter of giving the union advance notice in order to help it organize the new plant, that Carter drafted the clause as a gesture of good will toward the union, and that he demanded no concessions in return (for what was it to him which union got first crack at organizing the workers at the new plant?) and certainly did not demand a waiver of the union's statutory right to bargain. All this would matter little if one believed Carter instead, but that route is closed off by the Board's having upheld the administrative law judge's findings on credibility.

The Board itself said in its opinion, "It is undisputed that the clause was designed *solely* to accommodate the Union's desire to have the first opportunity to organize new employees at any new facilities created by National." 276 N.L.R.B. No. 14, at 6 (emphasis added; footnote omitted). If so, the statutory right to bargain was not affected; for to conclude that the clause also waived that right would be to assign a dual, not a single, purpose to the clause.

■ 2. The Board's opinion omits mention of the traditionally stringent test for whether a party to a collective bargaining contract has waived a statutory right. The courts and the Board have held over and over again that evidence that the parties intended to waive a statutory right must, to be credited, be clear and unmistakable. See, e.g., *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 and n. 12 (1983) (and cases cited there); *International Brotherhood of Electrical Workers, Local 1466 v. NLRB*, 795 F.2d 150, 155–56 (D.C.Cir.1986); *Tocco Division of Park-Ohio Industries, Inc. v. NLRB*, 702 F.2d 624, 626–27 (6th Cir.1983); *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 600 F.2d 918, 921–23 (D.C.Cir.1979); *Teledyne Wisconsin Motor*, 275 N.L.R.B. No. 76 (May 24, 1985); *International Union of Operating Engineers, Local Union 18*, 238 N.L.R.B. 652 (1978); *Awrey Bakeries, Inc.*, 217 N.L.R.B. 730, 733 (1975), aff'd, 548 F.2d 138 (6th Cir.1976) (per curiam); *Weltronic Co.*, 173 N.L.R.B. 235, 237 (1968), aff'd, 419 F.2d 1120 (6th Cir.1969); *Unit Drop Forge Division*, 171 N.L.R.B. 600, 601 (1968), modified on other grounds, 412 F.2d 108 (7th Cir. 1969); *Rockwell-Standard Corp.*, 166 N.L.R.B. 124, 132 (1967), aff'd, 410 F.2d 953 (6th Cir.1969); *C & C Plywood Corp.*, 148 N.L.R.B. 414, 416 (1964), enforcement denied on other grounds, 351 F.2d 224 (9th Cir.1965), rev'd, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); but see *Consolidated Foods Corp.*, 183 N.L.R.B. 832 (1970). In light of this rule, it is hard to see how the Board's interpretation of the collective bargaining agreement could be thought supported by substantial evidence.

We grant that despite the strong judicial endorsement of the rule, the Board—which knows more about the dynamics of collective bargaining than the courts—might be able to dilute or abandon it, since the rule is a nonobvious gloss on the statute. Cf. 5 Davis, Administrative Law Treatise § 29 (2d ed. 1984). And there are two bits of evidence that a desire to abandon or dilute, rather than mere oversight, does indeed lie behind the Board's failure to mention the rule. The first is that the administrative law judge had relied heavily on the presumption against inferring the waiver of a statutory right and that the union had argued the presumption vigorously throughout the case. So the Board could not just have forgotten about the rule; and if it didn't mention the rule just because it did not want to weaken the force of its opinion, this would be the equivalent of wanting to dilute or abandon the rule. Second, in support of the conclusion that the union had waived its statutory right the Board cited only *Consolidated Foods Corp., supra*, one of the few decisions that does not say that the waiver of a statutory right must be clear and unmistakable—though whether the omission to say this in *Consolidated* was deliberate or not is unclear.

■ All this is rather bootless conjecture, though. For it makes no difference

what the Board may have had in mind but failed to express; an administrative agency is not allowed to change direction without some explanation of what it is doing and why. This general principle of administrative law, see, e.g., *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); *Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465, 470–71 (7th Cir.1984); 4 Davis, Administrative Law § 20:11 (2d ed. 1983), has been applied to the Labor Board in such cases as *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1093–94 (7th Cir.1984), and *International Ass'n of Bridge Workers, Local No. 111 v. NLRB*, 792 F.2d 241, 247–48 (D.C. Cir.1986). As the last two cases show, the principle is applicable to adjudication as well as to explicit "notice and comment" rulemaking. The fact that the Board has such broad discretion in deciding which route to follow, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974), shows that the Board cannot be allowed to escape the obligation of justifying changes in its policies merely by following the common law route; the fact that common law rulemaking is retroactive buttresses this conclusion. So while not bound by *stare decisis*, the Board can jettison its precedents only if it has "adequately explicated the basis of its [new] interpretation." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 267, 95 S.Ct. 959, 968–69, 43 L.Ed.2d 171 (1975). Admittedly there was doubt in *Weingarten* whether the Board had done that, see *id.* at 268–69, 95 S.Ct. at 969 (dissenting opinion); and we must follow what the Supreme Court does and not just what it says. But in *Weingarten* there had been some attempt at explication, and here there was none. The citation to a previous decision of the Board that may have departed (but without explanation) from the traditional standard does not satisfy the duty to explicate; a previous violation of the duty cannot validate the subsequent one.

■ Forcing an administrative agency to 'fess up to its changes of position may seem productive merely of paper shuffling, and also inconsistent with the genius of the common law, which allows new doctrines to be created implicitly and even surreptitiously by judges who deny all the while that they are changing the law. See *Rockford League of Women Voters v. NRC*, 679 F.2d 1218, 1222 (7th Cir.1982). Yet agencies often are forced to explicate decisions that judges and juries, not to mention legislative and executive branch officials, are allowed to make without explanation. See, e.g., *Hameetman v. City of Chicago*, 776 F.2d 636, 645 (7th Cir.1985). The reason may be that agencies unlike courts are not constrained to make policy by the common law route, but can use explicit rulemaking procedures. Indeed, agencies are often criticized (none more so than the Labor Board) for not making greater use of their rulemaking powers, see, e.g., *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir.1966) (Friendly, J.); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 779, 89 S.Ct. 1426, 1436–37, 22 L.Ed.2d 709 (1969) (dissenting opinion), although *NLRB v. Bell Aerospace Co.*, supra, suggests that the criticism cuts little ice with the Supreme Court. Another consideration may be that independent agencies, such as the Labor Board, in combining legislative, executive, and judicial functions, seem somehow to elude the constitutional system of checks and balances. But these agencies are checked by other organs of government (as a legislature with executive and judicial functions, or an executive with legislative and judicial functions, would not be), even if they lack internal checks and balances— and the Administrative Procedure Act creates some. Moreover, the rule that the agency must explain its about-faces is not limited to the independent agencies; it extends to administrative agencies within the executive branch, as the *State Farm* decision shows. In any event, the Board violated the rule in this case.

■ 3. The Board disregarded evidence that in the negotiations over section 1.1(b) the words "discuss" and "negotiate" were not distinguished. The union's witnesses so testified, the administrative law judge believed them, and the Board accepted the administrative law judge's view of their believability. The union and the company

agree that the word "negotiate" as used in the same sentence of section 1.1(b) is synonymous with the statutory term "bargain"; so if "discuss" equals "negotiate," then "discuss" must also equal "bargain." Taking this view, and construing section 1.1(b) against its draftsman, one might conclude that the company had (perhaps inadvertently) reaffirmed the union's statutory right to bargain and may even have amplified it to take in bargaining over relocations not within the scope of the right because not motivated by disputes over terms or conditions of work. Against this conclusion it can be argued that no one reading "the Company agrees to discuss such relocation in advance and to negotiate with the Union concerning the effect of such relocation on employees" would think that "discuss" and "negotiate" meant the same thing; it would have been so much simpler to use one word rather than two. In addition, the Board might have invoked some version of the parol evidence rule and refused to consider testimony about the meaning of section 1.1(b). The courts have applied the rule to collective bargaining contracts in cases brought under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, see *Mohr v. Metro East Mfg. Co.,* 711 F.2d 69, 72 (7th Cir.1983), and cases cited there; no doubt the Board could do the same thing in its interpretation of such contracts. But it did not do it in this case. The Board's opinion contains no hint that testimony about the negotiating history of "discuss"—testimony it had credited by affirming the administrative law judge's findings on credibility—was actually inadmissible. The Board did mention the bargaining history, by which we assume it meant the union's not having demanded bargaining over the previous relocations. But it did not mention the union's explanation, accepted by the administrative law judge, that it had not demanded to bargain over those relocations because they had not cost any jobs. The Board seems to have confined its attention to evidence that supported its conclusion and to have ignored any contrary evidence—an ostrich's approach which administrative agencies are not authorized to follow.

The Board even omitted to consider a bit of evidence that favored its interpretation. The union had not demanded that the company bargain with it till six months after the union first learned of the possibility of relocation. Even if the union did not waive in the contract its statutory right to bargain, it may have waived its contractual right to invoke its statutory right by delay in invoking the contractual right. See, e.g., *International Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907, 918–19 (D.C. Cir.1972); *Mid-West Sanitary Service, Inc.,* 272 N.L.R.B. 624 (1984). But we cannot supply an alternative rationale for the Board's decision. See, e.g., *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *General Electric Co. v. NRC,* 750 F.2d 1394, 1403–04 (7th Cir.1984). Nor will we consider without a previous determination by the Board the company's defense of statute of limitations, which turns on a difficult question as to when the company refused to bargain.

The decision reversing the administrative law judge does not contain a reasoned analysis of the law and the evidence, and we therefore set aside the decision and return the case to the Board.

SO ORDERED.