AMALGAMATED LOCAL 813, INTERNATIONAL UNION, ALLIED INDUSTRIAL WORKERS OF AMERICA, Plaintiff,

v.

DIEBOLD INCORPORATED, Defendant.

No. C84–3816A.

United States District Court, N.D. Ohio, E.D.

Dec. 17, 1984.

John R. Doll, Dayton, Ohio, for plaintiff.

Jeremy P. Sherman, Seyferth, Shaw, Fairweather & Geraldson, Chicago, Ill., Lincoln Oviatt and J. Douglas Drushal,

Critchfield, Critchfield, Critchfield & Johnston, Wooster, Ohio, for defendant.

## ORDER

DOWD, District Judge.

Plaintiff, Amalgamated Local 813 (the Union), filed the above-captioned action against defendant Diebold Incorporated (Diebold), seeking injunctive relief for alleged violations of the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.*[1] Before the Court is the Union's motion for a preliminary injunction, requesting the Court to enjoin Diebold from laying off employees and transferring production equipment from its Wooster, Ohio facility to its Canton, Ohio facility. For the reasons which follow, the motion for a preliminary injunction is denied.

An evidentiary hearing was held in the above-captioned matter on December 12, 1984. Diebold's vice president of employee relations and the local Union's president, among others, were present at the hearing, as well as counsel for the parties. Premised upon the testimony of Charles Scheurer and Henry Varner and the exhibits admitted at trial, the Court makes the following findings of fact and conclusions of law.

In early 1982, the parties participated in collective bargaining for the purpose of continuing their collective bargaining agreement. Among others, Henry Varner, president of Local 813 and chairman of the bargaining committee, negotiated on behalf of the Union and Earl Wearstler, president of Diebold, negotiated on behalf of the company. One of the issues in dispute was whether the parties would enter into a two year or a three year collective bargaining agreement. In the past the parties had limited the collective bargaining agreements to only a two year period, consistent with the Union's reluctance to enter into contracts for a longer period of time. Wearstler represented to the Union that if the Union would accept a three year collective bargaining agreement, Diebold would add product lines to the Wooster facility and increase the number of employees. On May 23, 1982, the parties entered into a three year collective bargaining agreements. The contract expires on May 22, 1985.[2]

After the effective date of the collective bargaining agreement, but before November, 1983, Diebold added product lines and employees at the Wooster facility. One of the product lines added to the Wooster facility was the safety deposit box line. On November 9, 1983, Wearstler met with the Union leaders and asked the Union for immediate contract concessions. Wearstler told the Union that there was a decline in demand for the traditional security systems manufactured at the Wooster plant. Diebold's traditional customers, such as banks and other financial institutions, were increasing the use of electronic transfer devices and decreasing the use of security devices which store money and other valuables. Diebold submitted an outline of the causes of the company's financial problems to the Union. (*See* plaintiff's exhibit 2.) The Union rejected the request for concessions.

The employees at Diebold's Canton facility are represented by the International Brotherhood of Boilermakers, Local 1191. In May of 1984, Diebold entered into a five year collective bargaining agreement with Local 1191, which expires in May, 1989. Charles B. Scheurer, vice president of employee relations for Diebold, testified that Local 1191 agreed to substantial concessions in the area of labor costs in the collective bargaining agreement of May, 1984.

In a letter of November 16, 1984, Diebold informed the Union of its intent to close the manufacturing facility in Wooster, Ohio and to consolidate production with Diebold's facility in Canton, Ohio. (*See* plain-

---

1. Jurisdiction is invoked pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Union also alleges a promissory estoppel claim.

2. *See* Article XIX, Section 3 of the collective bargaining agreement (plaintiff's exhibit 1.)

tiff's exhibit 3.) Diebold informed the Union the consolidation process would begin December 1, 1984 and would be completed by May 1, 1985. On November 29, 1984, Union officials met with Diebold officials to discuss the procedures for the closing. At the meeting the Union requested the company to reconsider its position on closing the Wooster facility and requested collective bargaining on the issue. Company officials replied that the decision was a business judgment made by Diebold executives and the company would not reconsider its position. On December 6, 1984, Union officials again met with Diebold officials to discuss the procedures for the closing. Union officials again requested Diebold to reconsider its position; however, the company declined.

On December 10, 1984, approximately thirty-five employees were laid off when a production line was terminated at the Wooster facility. The Union filed a grievance alleging the lay off and termination of the production line violates the collective bargaining agreement. (*See* plaintiff's exhibit 4.) On December 11, 1984, Union officials asked Diebold officials not to move any of the equipment from the Wooster facility until the grievance was processed. The company refused and told the Union it intended to proceed with the transfer to the Canton facility as scheduled.

On December 12, 1984, the Union filed the action before the Court requesting, among other things, a temporary restraining order to enjoin the lay off of employees and the removal of production equipment until the grievance is processed through arbitration as provided in the collective bargaining agreement.[3] A hearing was held on the Union's request for immediate injunctive relief on December 12, 1984 at 5:30 p.m. in the United States Courthouse in Akron, Ohio. At the hearing the parties consented to conduct the hearing on the motion for a preliminary injunction.

[1] The primary legal authority guiding federal courts when considering whether to issue injunctions in federal labor disputes is the Norris-La Guardia Act. 29 U.S.C. § 101 *et seq*. In the Norris-La Guardia Act Congress provided as follows:

> No Court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. Congress provided further that federal courts may only issue injunctions in labor disputes after a hearing has been held on the matter, with the opportunity to present testimony and evidence, and after the court makes specific findings of fact. 29 U.S.C. § 107. Prior to issuing an injunction, the court must find that unlawful acts have been threatened and will be committed unless restrained, that substantial and irreparable harm will occur to the plaintiff, that the injury inflicted upon the plaintiff by denial of the injunction will be greater than the injury inflicted upon the defendant by granting the injunction, and that there is no adequate remedy at law.[4] 29 U.S.C. § 107(a)–(d). There is a strong federal policy against federal courts issuing injunctions in labor disputes as evidenced by the Norris-La Guardia Act.

[2] Equally strong as the federal policy against the issuance of injunctions in labor disputes, is the policy in favor of arbitration of labor disputes. The Supreme Court has held, "[t]he federal labor policy is to promote industrial stabilization through the Collective Bargaining Agreement. A major factor in achieving industrial peace is

---

**3.** *See* article V, Step 5 of the collective bargaining agreement.

**4.** The Court must also find that the public officers charged with the duty to protect the plain-

tiff's property are unwilling or unable to furnish adequate protection. 29 U.S.C. § 107(e). However, such a requirement applies to strike situations and not the action before the Court.

the inclusion of a provision for arbitration of grievances in the Collective Bargaining Agreement." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960); *see also, Canton Printing Pressmen v. Canton Repository*, 577 F.Supp. 455, 457 (N.D.Ohio 1983). The collective bargaining agreement in effect between the Union and Diebold provides for arbitration of unsettled grievances. The Union filed a grievance, which is proceeding to arbitration, alleging the closing of the Wooster plant violates the collective bargaining agreement.[5]

The Union asserts that if Diebold is permitted to lay off the employees in the Wooster facility and remove all of the equipment, an award in the Union's favor by the arbitrator will be a hollow victory, considering that it will not be possible to recommence operations at the Wooster facility. The Union asserts that the arbitration process will be in vain, thereby defeating the federal policy in favor of arbitration for labor disputes. Diebold asserts that the issuance of a preliminary injunction in this matter will defeat the federal policy against federal courts issuing injunctions in federal labor disputes. In the action *sub judice*, the Court is presented with the conflicting interests of the federal policy against injunctions and in favor of arbitrations in labor disputes.

In the case of *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that federal courts may issue injunctions in federal labor disputes to enforce arbitration provisions in collective bargaining agreements, but the Court must first comply with the requirements of the Norris-La Guardia Act. The *Boys Markets* case involved a request to restrain a union from striking over a dispute arising under the collective bargaining agreement, which provided for arbitration of such disputes. In the case of *Buffalo*

*Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Supreme Court reaffirmed its holding in *Boys Markets*, holding that injunctions may only be issued to prevent a strike when the dispute in question is subject to arbitration. *Id.* at 407, 96 S.Ct. at 3147.

Although the Supreme Court dealt with injunctions against strikes by Unions in the *Boys Markets* and *Buffalo Forge* cases, courts have recognized that such injunctions may be issued against employers to enforce the arbitration provision of a collective bargaining agreement if the requirements of the Norris-La Guardia Act are satisfied. *Aluminum Workers International Union v. Consolidated Aluminum Corp.*, 696 F.2d 437 (6th Cir.1982); *LaSalle Machine Tool, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 696 F.2d 452 (6th Cir.1982).

Primarily, the Court must determine if the underlying grievance is one which the parties are bound to arbitrate. At the hearing in this matter, counsel for Diebold conceded that the issue of whether the termination of operations and the lay off all employees at the Wooster facility is a violation of the collective bargaining agreement is an arbitrable issue. The Court must also determine whether the alleged breach of the collective bargaining agreement is an ongoing breach. It is also undisputed that if Diebold terminates operations at the Wooster facility and such termination is a breach of the collective bargaining agreement, the breach will be ongoing.

The issue of primary dispute between the parties is whether the termination of operations at the Wooster facility, the removal of production equipment, and the lay off of employees will constitute irreparable harm to the Union, which cannot be remedied if the Union is successful in arbitration. "Irreparable harm is injury so great that an

---

5. In the grievance the Union alleges the company violated Article XIX of the collective bargaining agreement which provides in pertinent part

"that neither party shall resort to strike, lockout or stoppage or impeding of work to enforce any demands...."

arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party. It renders the award an 'empty victory.'" *Aluminum Workers International Union v. Consolidated Aluminum Corp.*, 696 F.2d at 443 citing *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 286 (7th Cir.1981) and *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad*, 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960).

In the *Aluminum Workers* case, the court held that the loss of employment for sixteen persons as the result of job eliminations by a solvent employer is not irreparable harm under the Norris-La Guardia Act, absent an indication that the employer could not reinstate the employees or pay them wages for the period of unemployment if the Union is successful at arbitration. *Aluminum Workers*, 696 F.2d at 443. However, while not finding irreparable harm on the facts before the Court, the Court agreed with the finding of irreparable harm by the Fourth Circuit in the case of *Lever Brothers Co. v. International Chemical Workers Union*, 554 F.2d 115 (4th Cir.1976).

In *Lever Brothers*, the court affirmed the issuance of an injunction to maintain the status quo pending the outcome of arbitration, when the employer was closing a plant in Maryland and moving all the equipment to a plant in Indiana. The court held that by the time the Union proceeded to arbitration, it would be trying to persuade the arbitrator that the company could not move to Indiana, an action which had already been irreversibly accomplished. *See also Teamsters Local 71 v. Akers Motorlines, Inc.*, 582 F.2d 1336 (4th Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) (irreparable harm exists when an employer is closing and liquidating the assets of the business); *Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18*, 471 F.2d 872 (6th Cir.1972) (irreparable harm

does not exist when the dispute involves the replacement of an editing device for a newspaper with electronic editing equipment which will not be operated by Union employees.)

At the hearing in this matter, counsel for Diebold argued that the facts in this case are analogous to the *Aluminum Workers* case. Counsel for Diebold argued that currently one production line is being moved to Canton and only approximately thirty-five employees have been laid off. However, Charles B. Scheurer, vice president of employee relations for Diebold testified that by May 1, 1985, the entire Wooster facility will be closed, all the equipment will be removed, and all the employees would be laid off. Consequently, the facts of this case are more analogous to the facts in *Lever Brothers*, than in *Aluminum Workers* because the case involves a permanent lay off and a permanent termination of operations at Wooster.

Counsel for Diebold argued further that unlike the facts in *Lever Brothers*, Diebold's production facility is being moved a relatively short distance from Wooster to Canton.[6] In *Lever Brothers* the equipment was being moved from Maryland to Indiana. Counsel for Diebold represented that, if ordered by the arbitrator, Diebold could move all the equipment back to the Wooster facility and re-hire all the Wooster employees, providing for full back-pay. Although counsel for the plaintiff argued such a proposition, when questioned, Scheurer testified that he did not know if Diebold could reassemble the Wooster plant and recommence operations once all production equipment had been removed. Although the burden remains on the Union to show irreparable harm, the Court will not assume that Diebold can reassemble the Wooster facility without any showing of such by Diebold.

█ Nonetheless, the Court concludes there is no irreparable harm to the Union. But for the collective bargaining agreement under which the parties are operat-

---

**6.** The Court takes judicial notice of the fact that Canton and Wooster are the county seats of adjoining counties, Stark and Wayne, and are located approximately 35 miles apart.

ing, the Union would not have a cause of action in this Court or a grievance for arbitration regarding Diebold's decision to permanently terminate operations at the Wooster facility. The collective bargaining agreement between the parties expires on May 22, 1985. Following the expiration of the collective bargaining agreement, the company has a right to terminate operations at the Wooster facility. The company must participate in collective bargaining regarding the effects of the termination of operations at Wooster, but not the decision to terminate operations. *First National Maintenance Corporation v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). Consequently, the issue before the arbitrator will be whether it is a breach of the collective bargaining agreement for the company to terminate operations at the Wooster facility between December 1, 1984 and May 22, 1985. The arbitrator will not have the power to order Diebold to recommence production operations at the Wooster facility after May 22, 1985. Therefore, if the Union is successful, the arbitrator could provide the Union complete relief by awarding back-pay until May 22, 1985. If the arbitrator were to make an award in favor of the Union prior to May 22, 1985, he could order front-pay until May 22, 1985.[7]

At the hearing in this matter, counsel for the Union argued that collective bargaining on a new contract may result in a continuation of operations at the Wooster facility. Counsel for the Union speculated that the Union may agree to substantial concessions in order to keep the Wooster facility operating. However, Scheurer testified that Diebold had made a business decision to terminate operations at the Wooster facility and that the company would not negoti-

ate whether to close the plant. Scheurer testified that even if the employees were willing to work for minimum wage, Diebold was going to close the Wooster facility. The unyielding position of the company is buttressed by the fact that when Diebold informed the Union in late November and early December of 1984 of the intention to close the Wooster facility, Diebold twice refused to negotiate the issue with the Union. Without a collective bargaining agreement in effect after May 22, 1985, the only remedy available to the arbitrator will be back-pay and front-pay; consequently, there is no irreparable harm to the Union by the termination of the operations at the Wooster facility.

The Court's holding is limited to the peculiar facts of this case. The Court intimates no view on the result if there was a showing by the Union that Diebold was experiencing financial difficulties and could not pay an award as issued by an arbitrator for back-pay or front-pay. In the action before the Court, there is less than six months between the time the Union was informed of the intent to shut down the Wooster facility and the termination of the collective bargaining agreement. The Court intimates no view on the result if the collective bargaining agreement was going to be in effect for a longer period of time. The Court recognizes that the holding in this case does not resolve a significant issue i.e. at what point during the term of a collective bargaining agreement does a plant shut-down become irreparable harm to the Union. However, the Court's holding is limited to the facts in this case when the Union was informed of the intent to terminate the operations at the plant within six months of the termination of the collective bargaining agreement and the possibil-

---

7. This case is distinguishable from a pure relocation case when an employer is simply relocating its facilities from one location to another location where no plant of the employer currently exists. In *First National Maintenance,* the Supreme Court expressly declined to decide whether an employer had to collectively bargain a management decision to relocate a plant. 452 U.S. at 686, n. 22, 101 S.Ct. at 2584, n. 22. In the case before the Court, Diebold is closing down its Wooster facility and consolidating operations with the Canton facility. There will be approximately 300 employees laid off at the Wooster facility and approximately 100 employees currently laid off will be recalled at the Canton facility. Because of a declining market for the products Diebold manufactures in Northern Ohio, the company no longer needs two plants.

ity of persuading the employer not to terminate operations at the plant is *de minimis*.

■ The Union also asserts this Court has the power to enjoin Diebold from terminating operations at the Wooster facility premised upon a promissory estoppel theory. The Union asserts that in May, 1982, Wearstler represented that production would be increased at Wooster and employees would be added if the Union accepted a three year collective bargaining agreement. The Union asserts that Wearstler's representations, at a minimum, infer that the Wooster facility would not be closed. The Union asserts that it relied on Wearstler's representations when it accepted the three year collective bargaining agreement. The Union asserts that Diebold should be estopped from terminating operations at the Wooster facility because of the Union's reliance on Wearstler's representations.

The Union has provided no authority to support the proposition that this Court can enjoin an employer from closing a plant premised upon a promissory estoppel theory. The Union cites the case of *Local 1330, United Steelworkers v. U.S. Steel*, 631 F.2d 1264 (6th Cir.1980) to support the proposition that this Court can enjoin Diebold. The Court does not read *Local 1330* to support the Union's position. In *Local 1330*, the Court specifically held "complete analysis of plaintiffs-appellants' promissory estoppel claims against the back drop of the collective bargaining agreement and Section 301 of the National Labor Relations Act would be a formidable task. We decline to undertake it...." *Id.* at 1279. In *Boys Markets*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 and *Buffalo Forge*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022, the Supreme Court set forth the limited circumstances when a federal court should issue an injunction in a labor dispute. The Union cannot circumvent federal labor law by alleging promissory estoppel under state law.

Accordingly, the Court finds the Union fails to establish irreparable harm to warrant the issuance of a preliminary injunction against Diebold.

■ Although the Court need not address the issue once it has found there is no irreparable harm to the Union, in the interest of judicial economy, the Court will decide whether the issuance of the injunction will harm Diebold greater than the failure to issue the injunction will harm the Union.

In an affidavit filed with the Court on December 12, 1984, Scheurer attests that if the company is prevented from proceeding with the termination of operations at the Wooster facility it will suffer significant financial losses. Scheurer estimates that the loss in production will cost Diebold approximately $150,000.00 per week. However, at the hearing, Scheurer testified that Diebold could continue production at Wooster and not lose profits from the failure to produce the safety deposit box line. Diebold would only lose $150,000.00 a week if the safety deposit boxes are not manufactured anywhere, rather than if they are manufactured at the Wooster facility.

Scheurer testified further that Diebold will lose the costs associated with the contractors who have been hired to move the safety deposit box production line from Wooster to Canton. However, the harm to Diebold from the loss of the costs associated with relocation are not as severe as the loss to the three hundred employees who will be permanently discharged. Consequently, the injury inflicted upon the Union by the denial of the injunction will be greater than the injury inflicted upon Diebold by granting the injunction.

Pursuant to the reasons set forth above, the Union's motion for a preliminary injunction is denied.

IT IS SO ORDERED.