IUE–CWA, Local 628, Plaintiff,

v.

FLOWSERVE CORPORATION OF
PENNSYLVANIA, Defendant.

No. 4:02–CV–2225.

United States District Court,
M.D. Pennsylvania.

Jan. 6, 2003.

Claiborne S. Newlin, Meranze and Katz, Philadelphia, PA, for plaintiff.

Robert B. Cottington, Reed Smith Shaw & McClay, Pittsburgh, PA, Mark A. Fontana, Reed Smith LLP, Harrisburg, PA, Michael McAuliffe Miller, Harrisburg, PA, Robert B. Cottington, Reed Smith LLP, Harrisburg, PA, for defendant.

### MEMORANDUM AND ORDER

JONES, District Judge.

Pending before the Court is plaintiff International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America (IUE–CWA), LOCAL 628's motion for a temporary restraining order and preliminary injunction against defendant Flowserve Corporation of Pennsylvania ("Flowserve").

This Court has jurisdiction over this matter pursuant to Section 302 of the Labor Management Relations Act of 1947 as amended, 29 U.S.C. § 185.

## PROCEDURAL HISTORY:

Plaintiff initiated this action by filing a complaint in this Middle District of Pennsylvania on December 6, 2002. Also on that date, plaintiff filed the motion currently before the Court.

On December 9, 2002, Judge James F. McClure entered a stipulated consent order preventing defendant from taking specific actions that would alter the status quo between plaintiff and defendant until a hearing was held in reference to plaintiff's motion. That hearing was held on December 19, 2002.

On the same date as the hearing but after its completion, the undersigned entered a order providing *inter alia* that Flowserve would not layoff any bargaining unit employees, remove any machinery from its facility located at 701 First Street, Williamsport, Pennsylvania, or relinquish physical possession of the aforementioned facility until further order of Court.

The matter is now ripe for disposition. Both parties have presented testimonial and documentary evidence, as well as post-hearing briefs.

Today we rule that plaintiff is not entitled to injunctive relief and we dissolve any orders heretofore entered.

More specifically, based upon a review of the record evidence, and after assessing the credibility of the parties' respective witnesses, the court makes the following findings of fact and law.

## FACTUAL HISTORY:

Flowserve operates a facility in Williamsport ("the Williamsport facility" or "the plant") at which it manufactures valves for the nuclear industry. The Williamsport facility is a branch of the Flowserve Corporation, a publicly traded company on the New York Stock Exchange with an excess of $2.5 billion in sales in 2001. IUE–CWA, Local 628 ("the Union") is a labor organization representing employees in the manufacturing industry. The Union represents production and maintenance employees at the Williamsport facility.

The Union and Flowserve are parties to a collective bargaining agreement ("CBA") which commenced on June 3, 2000 and is in effect until May 31, 2003. The CBA provides that it is to remain in effect after that date from year to year unless one party gives the other sixty days written notice, before the end of the contract period or yearly renewal, of its intention to modify or terminate the agreement.

In May 2002, Flowserve completed the purchase of a division of Invensys Corporation. Subsequent to the purchase, Flowserve decided to close several of its plants, including the Williamsport facility. Flowserve estimates that closing the plant will save the company $333,000 per month.

Initially, Flowserve planned to close the Williamsport facility by February 2003. However, after receiving a large valve order from a Taiwanese company, Flowserve altered its plans and determined it would not close the plant until mid–2003.

On July 9, 2002, Flowserve notified the Union that it would close the Williamsport facility by mid–2003 and consolidate the plant's operations with its Raleigh, North Carolina plant. Thereafter, the Union and Flowserve engaged in bargaining sessions regarding the effects of the decision to close the plant. None of the bargaining sessions proved fruitful, and on September 24, 2002, the Union filed a grievance claiming that Flowserve's decision to close the plant and consolidate operations with the Raleigh plant breached the CBA.[1]

---

1. The Union has also filed administrative charges against Flowserve with the National

Pursuant to an arbitration clause within the CBA, the parties have agreed to arbitrate the relocation grievance through the American Arbitration Association voluntary arbitration procedure. Arbitrator Jeffrey B. Tener has been selected to hear the union's grievance on January 15, 2002.

On November 15, 2002, Flowserve notified the Union that it would commence laying off bargaining unit members in December 2002 as part of the relocation. According to Flowserve's current plan, twelve employees were scheduled to be terminated in December 2002, followed by fourteen in January 2003, twelve in February 2003, eight in March 2003, five in April 2003, and the remaining ten in May 2003. In addition, Flowserve has begun, and has indicated that it will continue, to move raw materials, equipment and machinery out of Williamsport to Raleigh, North Carolina. At the hearing, John Chappell, General Manager of the Williamsport and Raleigh plants, testified that Flowserve intends to move a total of fourteen machines from the Williamsport plant to the Raleigh plan. One machine has already been moved, and Chappell testified that the remaining thirteen will not be moved until they are no longer needed for manufacturing in Williamsport.

Chappell also testified that Flowserve's policy and past practice has been to extend medical benefits to laid of employees for three months following the date of layoff. Chappell testified that this practice would be extended to the employees being affected by the plant closing at issue here. Flowserve's policy provides that laid off employees receiving medical benefits during the aforementioned three months will not pay any more in employee contributions toward the premium for medical benefits than they would as an active employee.

Labor Relations Board. These charges are

The Union has requested that Flowserve maintain the status quo until the arbitrator renders his award; Flowserve has refused these requests.

**DISCUSSION:**

At the outset we note that federal policy clearly indicates that Congress discourages the issuance of injunctions in labor disputes by federal courts. The Norris–LaGuardia Act ("NLA"), 29 U.S.C. § 101 *et seq.*, provides that "[n]o court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute." Seemingly at odds with the NLA is the federal policy encouraging the use of arbitration in labor disputes. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409(1960)("A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the Collective Bargaining Agreement"). Presumably in recognition of this dichotomy, the Supreme Court has carved out a narrow exception to the blanket prohibition of injunctions in labor disputes as provided for within the NLA: a federal court may issue an injunction when necessary to compel parties to comply with a mandatory arbitration clause within a collective bargaining agreement ("CBA"). *See Boys Markets, Inc., v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

 In order to determine whether the exception delineated by the Supreme Court in *Boys Markets* is applicable to the facts relevant to the case at bar we must consider: "1) whether the underlying disputes is subject to mandatory arbitration, 2) whether the employer, rather than seek-

still pending.

ing arbitration of his grievance, is interfering with and frustrating the arbitral processes ... which the parties ha[ve] chosen, and 3) whether an injunction would be appropriate under ordinary principles of equity." *United Steelworkers of America, AFL–CIO, v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1278–79(3d Cir.1979).

## A. Arbitrability of Dispute

Because Flowserve has agreed to arbitrate the Union's grievance and because Flowserve's counsel has conceded the issue of whether the dispute is arbitrable, we find that the first factor has been satisfied.

## B. Frustration of Arbitral Process

■ With regard to the second prong of the aforementioned test, "the arbitral processes are frustrated when the arbitrator's award is no more than a hollow formality because when rendered (it) could not return the parties substantially to the [s]tatus quo ante." *Fort Pitt,* 598 F.2d at 1282 (*citing Lever Bros. v. International Chemical Workers, Local 217,* 554 F.2d 115(4th Cir.1976)).

The Union argues that if Flowserve is permitted to continue to transfer spare parts, raw materials and machinery to the Raleigh site and if it is allowed to continue layoffs pending the arbitrator's decision, then even in the event that arbitration worked in the Union's favor the arbitration would for all intents and purposes be meaningless. According to the Union, under normal circumstances if an arbitrator were to find that Flowserve had breached the CBA the arbitrator would require Flowserve to discontinue its relocation plans and to cease any layoffs for the remainder of the contract term. The Union therefore reasons that if the court does not issue an injunction the process of winding down plant activities would continue and it would no longer be feasible for the

arbitrator to order the foregoing. Thus, if Flowserve is permitted to continue liquidating its Williamsport facility, the Union contends that arbitration would be a futile exercise.

■ We disagree with the Union. At the hearing in this matter John Chappell indicated that were Arbitrator Tener to order Flowserve to cease layoffs and continue operations at the Williamsport facility until the expiration of the CBA, Flowserve would in fact be able to comply with that order. Because we find Mr. Chappell to be a credible witness and because there is every indication that Flowserve would, if ordered to, have the economic means to return equipment to the Williamsport facility and rehire laid off employees thereby returning the parties to the status quo ante, we believe that arbitration cannot be said to be merely a "hollow formality." *Fort Pitt,* 598 F.2d at 1282. We have therefore determined that Flowserve has done nothing to obstruct the arbitral process.

## C. Equity

■ In deciding whether an injunction should issue the court must consider the following four factors: "1) whether the movant has demonstrated a reasonable probability of success on the merits; 2) whether the movant will suffer irreparable injury if the injunction does not issue; 3) whether granting the injunction will result in even greater harm to the nonmoving party; and 4) whether granting the injunction serves the public interest." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Textron Lycoming Reciprocating Engine Division, Avco Corp.,* 919 F.Supp. 783, 789 (M.D.Pa. 1996) (citations and quotations omitted). The Union, as the party seeking injunctive relief, bears the burden of proof in estab-

lishing these factors. *Id.* (*citing American Telephone and Telegraph Co. v. Winback and Conserve Program*, 42 F.3d 1421, 1427(3d Cir.1994)).

### i. Probability of Success on the Merits

■ Demonstrating a probability of success on the merits is not an onerous burden. The Third Circuit has held that "in the context of a *Boys Markets* injunction, the union need only show that the position it takes is sufficiently sound to prevent the arbitration from being a futile endeavor." *Nursing Home & Hospital Union No. 434 AFL–CIO–LDIU v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 n. 3(3d Cir.1985)(*citing Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 284(7th Cir.1981)); *Lever Bros. Co. v. International Chemical Workers Local 217*, 554 F.2d 115, 120(4th Cir. 1976). "To hold the union to a stricter standard of proof would intrude significantly on the arbitrator's function, and result in ... judicial preemption of the arbitral process ..." *Id.* Because we believe that the Union has at least made a colorable claim against Flowserve (i.e. that by relocating work, terminating employees, and permanently closing the facility Flowserve has breached provisions of the CBA) we find that the Union has established a likelihood of success on the merits.

### ii. Irreparable Harm

■ "The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *Textron Lycoming*, 919 F.Supp. at 789 (*citing SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir.1985)). In order to constitute irreparable harm, an "injury [must be] so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party. It [would] render[ ] the award an empty victory." *Amalgamated Local 813, International Union, Allied Industrial Workers of America v. Diebold Inc.*, 605 F.Supp. 32, 35–6 (N.D.Ohio 1984).

The focal point of the instant dispute between Flowserve and the Union is whether the actions taken thus far by Flowserve in relation to the closing of the Williamsport facility constitute irreparable harm to the Union which cannot be ameliorated by Arbitrator Tener if he rules in the Union's favor.

■ Flowserve argues, and this Court agrees, that the facts of this case are analogous to the *Diebold* case. In *Diebold*, 605 F.Supp. 32 (N.D.Ohio 1984), a union filed a motion against the employer seeking injunctive relief to prevent the employer from laying off employees and transferring production equipment from one facility to another. The Court held that injunctive relief was not appropriate where the union was notified that the employer intended to close the plant within six months of the termination of the collective bargaining agreement in effect between the parties, where it was highly unlikely that the union would be able to convince the employer not to close the plant, and where without a collective bargaining agreement in effect the only remedy available to the arbitrator would be back-pay and front-pay.[2] *See id.* at 37–38.

---

**2.** District Judge Dowd was exacting in limiting the holding of the case to the particular facts before him: "The Court intimates no view on the result if there was a showing by the Union that Diebold [ (the employer) ] was experiencing financial difficulties and could not pay an award as issued by an arbitrator for back-pay or front-pay. In the action before the Court, there is less than six months between the time the Union was informed of the intent to shut down the Wooster facility and the termination of the collective bargain-

In this regard, "[f]ollowing the expiration of the [CBA], [Flowserve] has a right to terminate operations at the [Williamsport] facility. [Thus, while Flowserve] must participate in collective bargaining regarding the effects of the termination of operations at [Williamsport], [it is not bound to bargain over] ... the decision to terminate operations." *Diebold,* 605 F.Supp. at 37 (N.D.Ohio 1984)(*citing First National Maintenance Corp., v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981)).[3] Consequently, even if the

Arbitrator Tener were to issue an award in the Union's favor, he would not have the power to order Flowserve to recommence operations at Williamsport subsequent to the expiration of the CBA—May 31, 2003. Arbitrator Tener could however, provide the Union with complete relief by awarding its members back or front-pay, whichever may be appropriate.[4]

Plaintiff also argues that it has demonstrated irreparable harm by virtue of the fact that laid off employees will be forced

---

ing agreement. The Court intimates no view on the result of the collective bargaining agreement was going to be in effect for a longer period of time." *Diebold,* 605 F.Supp. at 37.

Here, it is clear to the Court that the probability that Flowserve will alter its current plans and preserve its operations in Williamsport is *de minimus.* Flowserve informed the Union on July 9, 2002 that it would close its operations at Williamsport facility in mid–2003—nearly eleven months before the expiration of the CBA. Thereafter, although Flowserve and the Union engaged in a number of bargaining sessions over the effects of the closing, Flowserve indicated that it would not alter its decision to close the plant. In spite of the fact that Flowserve informed the Union of the closing over what may be considered a considerably longer period than that applicable in the *Diebold* case, because there is every indication that Flowserve's business decision to close plant will not be influenced by any amount concessions made by the Union, we find the rationale and holding of *Diebold* to be extremely persuasive in the case at bar.

3. In *First National Maintenance,* the Supreme Court specifically held that an employer did not have a duty to bargain over a decision to shut down part of its business when the decision was made for purely economic reasons. As noted by the *Diebold* Court, the Supreme Court expressly declined to decide whether other management decisions, including plant relocations, were subject to the mandatory bargaining provisions of § 8(d) of the National Labor Relations Act. *See First National Maintenance,* 452 U.S. at 686, n. 22, 101 S.Ct. 2573. Thus, in holding that the employer did not have a duty to bargain over its decision to terminate operations at a particu-

lar plant, the *Diebold* Court distinguished the facts before it—involving the closing of one facility and the consolidation of that facility's operations with those of a different plant— from a pure relocation case where an employer relocates its facilities from one location to a different location where no plant of the employer currently exists. *See Diebold,* 605 F.Supp. at 37, n. 7; *see also Comite Organizador de Trabajadores Agricolas (COTA) v. Molinelli,* 114 N.J. 87, 552 A.2d 1003, 1012 (1989)(*"First National Maintenance* has been cited consistently to support findings that an employer must bargain over the effects of a decision made without anti-union animus to terminate or relocate operations but not over the decision itself").

We adopt the reasoning of the *Diebold* Court with the belief that were the Third Circuit to be presented with the same set of facts, they would rule similarly. Further, we note that Flowserve has also closed, or is in the process of closing, plants in Scarborough, Ontario; Jeffersonville, Indiana; Olive Branch, Mississippi; Marlborough, Massachusetts; Liberty, North Carolina; and Provo, Utah so as to eliminate redundancies between its facilities and reduce its overall costs. There is no indication, nor was any testimony presented in support of a finding, that the reason for the relocation has to do with anti-union animus.

4. This Court did consider issuing a partial injunction to restrain Flowserve from selling the Williamsport facility until Arbitrator Tener rendered his decision. However, based upon testimony heard, we are confident that no sale could be completed until past the expiration of the CBA.

to forego medical care because they will be unable to purchase coverage. See *Fort Pitt,* 598 F.2d at 1280 ("the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury' "). Where, as here, the employer has in effect guaranteed health care coverage to its employees for three months subsequent to their termination, we find that irreparable injury has not been established.

Therefore, we conclude that the Union has not met its burden of establishing that irreparable harm would result in the event that its prayer for injunctive relief were denied.

### iii. Harm to Nonmoving Party

█ The balancing of the harms does not support issuance of the injunction.

Flowserve approximates that the closing of the Williamsport facility and the consolidation with the Raleigh plant will save the company about $3.9 million per year. It is the Court's understanding based on John Chappell's testimony that were an injunction to be issued, Flowserve would lose approximately $333,000 per month of those savings.

On the other hand, in the event that an injunction does not issue, any losses that Union employees would bear could be rectified by a money award by Arbitrator Tener. In addition we note, again based on John Chappell's testimony, that medical benefits for Union employees are extended for three months subsequent to their termination from Flowerve. During that period, the employees must pay the same contribution as due while employed. After the three month period has passed, the employees will have access to private health insurance.

### iv. Public Interest

As stated previously, we recognize that a strong federal policy exists "favoring voluntary resolution of labor disputes [so as to] prevent[ ] the employer for escaping its promise to arbitrate and from frustrating the arbitral process through dissolution of its assets." *Sky Vue Terrace,* 759 F.2d at 1099. Although standing alone, we find that this factor weighs in favor of the granting of injunctive relief, based upon our reasoning as set forth in considering the other factors, we decline to issue an injunction.

### CONCLUSION:

Based on the foregoing, we find that although the instant dispute may be arbitrable, Flowserve has not interfered with or frustrated the arbitral process. We are aware that the closing of this facility will have devastating consequences on most of Flowserve's Pennsylvania employees and their families. Plant closings, relocations, and consolidations are increasingly the norm rather than the exception during these difficult economic times. While it is incumbent upon employers to seek greater efficiencies, the resulting contraction provides solace to the managers and shareholders, but not to the dedicated employees. Nonetheless, as our analysis makes clear, this Court must follow the law as we find it. Weighing the four factors relevant to an equity analysis, equitable principles render us powerless to issue an injunction.

### NOW, THEREFORE, IT IS ORDERED THAT:

1. Plaintiff's motion for a temporary restraining order and preliminary injunction (doc. 2) is denied.

2. Plaintiff's motion to supplement the record (doc. 26) is granted.

3. Defendant's motion for leave to file a supplemental brief (doc. 27) is granted.

4. The order entered by the Court on December 19, 2002, is hereby dissolved.

5. The Clerk is directed to close the file on the case.