COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO

v.

VERIZON COMMUNICATIONS, INC.
Verizon Pennsylvania, Inc., and
Verizon Delaware, Inc.

No. CIV.A. 02–CV–8893.

United States District Court,
E.D. Pennsylvania.

March 31, 2003.

Richard H. Markowitz, Paula R. Markowitz, Nancy A. Walker, Markowitz & Richman, Philadelphia, PA, for Plaintiffs.

Jack W. Campbell, IV, Jones Day, Washington, DC, for Defendants.

## DECISION

JOYNER, District Judge.

This case has been brought before this Court for disposition of the Plaintiff's motion for issuance of a preliminary injunction to enjoin the defendant from terminating its payment of medical benefits for some 249 employees who it laid off in December, 2002 until such time as the arbitration of the underlying dispute in this matter can be completed. Following an evidentiary hearing in this matter on March 21, 2003, we now make the following:

### Findings of Fact

1. Plaintiff is the Communications Workers of America, AFL–CIO (hereinafter "CWA"), an unincorporated association and labor organization within the meaning of the Labor Relations Act, 29 U.S.C. § 152 which represents employees of Defendants Verizon Communications, Inc., Verizon Pennsylvania, Inc. and Verizon Delaware, Inc. and which maintains offices at 230 South Broad Street, Philadelphia, Pennsylvania.

2. Defendants are Verizon Communications, Inc., Verizon Pennsylvania, Inc. and Verizon Delaware, Inc. Verizon Communications, Inc. is headquartered at 1095 Avenue of the Americas, New York, New York. Verizon Pennsylvania, Inc. and Verizon Delaware, Inc. are wholly-owned subsidiaries of Verizon Communications, Inc. with offices at 1717 Arch Street, Philadelphia, Pennsylvania and 901 Tatnall Street, Wilmington, Delaware, respectively. The Verizon defendants are employers in an

industry affecting commerce within the meaning of the Labor Relations Act, 29 U.S.C. § 152.

3. Plaintiff CWA is the bargaining representative for the bargaining units of Verizon employees in Pennsylvania and Delaware. CWA Locals 13000 and 13500 represent employees of Verizon Pennsylvania and CWA Locals 13100 and 13101 represent employees of Verizon Delaware.

4. Verizon and CWA Locals 13000, 13100, 13101 and 13500 are party to four collective bargaining agreements ("CBAs") which became effective on August 6, 2000 and continue in effect until 11:59 p.m. on August 2, 2003.

5. The Local 13000 collective bargaining agreement contains the following provision:

> 17.02. The Company, except in emergencies, will not enter into contracts with any company or agency, to do work which is similar in nature to that normally done by the Company's employees, if:
>
> > 17.021 Such action, in the judgment of the Company, would currently result in the layoff or part-timing of employees in the same occupation and Operating Area as those who would normally perform the work to be done under the contract.

6. The Local 13101 collective bargaining agreement includes a similar provision, which states:

> 9.01. The Company will maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained, and operated by the Company; provided that the Company may contract work, if such contracting will not currently and directly result in the layoff or part-timing of Regular employees.

Neither of these provisions exist in the CBAs between Locals 13500 and 13100.

7. In addition, the parties entered into an Agreement Concerning Issues Related to the Bell–Atlantic–GTE Merger, which provides the following, in pertinent part:

> A. *No Involuntary Layoffs, etc.* Effective August 6, 2000 and terminating concurrently with the labor agreements, August 2, 2003, the Companies agree that there shall be no layoffs, forced transfers requiring a home relocation, or downgrades as a result of any company initiated "process change," which includes process reengineering initiatives, workplace consolidations, office closings, contracting, shifting of bargaining unit work, network upgrades, and other business changes, developed to accommodate new technology or to improve productivity, efficiency or methods of operation. . . .
>
> C. *Change in Business Conditions* Any job loss caused by an "external event" as that term is used in a letter dated April 3, 1994 from James J. Dowdall to Elisa Riordan ("Job Security Letter"), is specifically excluded from the terms of the commitments made in section A above.

Under paragraph 3 of the "Job Security Letter,"

> The parties also agree that an "external event" that is viewed as significant and that directly reduces the need for a large number of employees, shall not be considered "process change." An example of an external event might be a state or federal regulatory change that causes the Company to abandon a line of business, an interexchange carrier take-back of billings and collections, or the loss of a major telecommunications network contract. An external event of this nature shall be covered by the additional step(s) of the FAP.

8. Included in all four CBAs are provisions for an "Income Security Plan/En-

hanced Income Security Plan," which read as follows:

> If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in any job title in a work location which will necessitate lay-offs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work locations requiring a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees who have at least one (1) year of met credited service may elect, in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Security Plan (ISP) and if applicable, during the term of this agreement, Enhanced Income Security Plan (Enhanced ISP) benefits described in this Section, subject to the following conditions. . . .

*ISP Termination Allowance*

> (a) For an employee who so elects in accordance with this Section, the Company will pay an ISP Termination Allowance of one Thousand and One Hundred Dollars ($1,100.00), less withholding taxes, for each completed year of net credited service up to and including thirty (30) years, for a maximum of Thirty Three Thousand Dollars ($33,000.00) prior to withholding taxes. Furthermore, prior to proceeding to a layoff resulting from a surplus in any particular title, location, and work group, the Company will offer an Enhanced ISP Termination Allowance equal to two (2) times the normal ISP Termination Allowance (e.g., up to a maximum of $66,000) in the surplus title and location. . .

9. Via correspondence dated September 19, 2002, Defendants notified Plaintiff that there existed a surplus of employees employed by Defendants in Pennsylvania and Delaware which affected members of the plaintiff union. Defendants also announced that they intended to offer Enhanced Income Security Plan ("EISP") benefits to several hundred of the affected employees but that unless a sufficient number of employees accepted the EISP benefits offered to reduce the surplus, the defendants would proceed to layoffs.

10. Defendants subsequently made two EISP offers in September and November, 2002 which a number of bargaining unit employees accepted. However, not all of the eligible bargaining unit employees who could have taken the enhanced ISP accepted it and as a consequence there remained a surplus of 249 employees who were laid off on December 12 and December 19, 2002. All of the employees who were laid off were members of Local 13000. Had another 249 eligible employees accepted the enhanced ISP offer, the layoffs would not have been necessary.

11. Under the CBAs and the "Verizon Managed Care Network and Medical Expense Plan for Mid–Atlantic Associates," certain severance benefits or layoff allowances were provided for, depending upon the length of service that an employee had with Defendants. Included among these allowances was continued, company-paid health insurance premiums, which also depended upon the length of time that an employee had worked for the company. Specifically, if the employee had completed less than one year of service, his or her company-paid medical coverage would terminate at the end of the month in which the termination occurred. If an employee had completed between one and five years of service with the company, the paid medical benefits would cease on the last day of

the third month after the termination occurred. For employees with five years or more of service, their company-paid medical benefits would terminate on the last day of the twelfth month after termination. 239 of the 249 employees affected by the December 12 and December 19, 2002 layoffs had between one and five years of service with defendants, six had more than five years of service, and four were retirement-eligible and qualified for company-paid benefits through retirement.

12. The parties had also negotiated a "Memorandum of Understanding Concerning Common Issues," dated August 23, 2000 which was essentially incorporated into the collective bargaining agreements and was effective as of August 6, 2000. Included in the Memorandum of Understanding, were provisions requiring that in the case of a discharged employee reinstated to employment with full back pay or an employee who was to otherwise be made "whole," that employee was to receive, *inter alia*, reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage (if the employee continued those coverages under COBRA) or reimbursement for out-of-pocket medical, vision and dental expenses if the employee would not have incurred those expenses had they remained on the company's payroll.

13. It is the plaintiff's position that the December 12 and December 19, 2002 layoffs were in violation of Section 17.02 of the Local 13000 and Section 9.01 of the Local 13101 collective bargaining agreements and the Merger Agreement since Defendants were continuing to use outside contract labor to perform work which was normally performed by bargaining unit employees and because the layoffs were not caused by an "external event" as that term is defined in the Merger Agreement and the April 3, 1994 Job Security Letter. The defendants believe that the layoffs are permitted under Article 9 of the Local 13000 CBA and the Merger Agreement because the layoffs are the result of an "external event."

14. On October 7, 2002, the plaintiff gave notice to Defendants that it had initiated a grievance of this dispute on behalf of Local 13000 as a violation of Article 9, section 9.05 of the CBA and the Agreement Concerning Issues Related to the Bell Atlantic–GTE Merger. On December 3, 2002, the union amended the grievance to extend to Locals 13500, 13100 and 13101.

15. On December 23, 2002, Plaintiff gave notice to Defendants that it wished to immediately submit the issue of the legality of the layoffs to the American Arbitration Association, identified its chosen arbitrator and requested that Defendants promptly advise it if it had any objection to immediate arbitration.

16. On January 3, 2003, Defendants responded to Plaintiff's December 23, 2002 correspondence by noting that while they considered the plaintiff's arbitration submission to be invalid and ineffective because it failed to first follow the grievance procedure, they nevertheless were prepared to move the grievance to arbitration. In that letter, Defendants further identified their chosen arbitrator and suggested three neutral arbitrators, one of whom was then hearing the CWA's related contract violation arbitration concerning layoffs at Verizon–New York and could begin hearings on January 23, 2003.

17. Plaintiff rejected the arbitrators proposed by Defendants and instead formally submitted the dispute to the American Arbitration Association. Although Defendants received a "strike list" of proposed arbitrators on January 10, 2003, it initially took the position that it would not act on that list until such time as the propriety of arbitration was resolved.

However, on February 3, 2003, the parties agreed to the selection of Robert Gorman as their arbitrator.

18. Upon the selection of the arbitrator, the American Arbitration Association ("AAA") suggested hearing dates of March 26 and 27, and April 29, 2003. Those dates, however, were unacceptable to Defendants due to the unavailability of their attorney. Because the parties generally do not conduct arbitrations while they are in contract negotiations, it was assumed that they would not arbitrate this matter over the summer months and they eventually agreed to conduct arbitration hearings on October 9 and 10, 2003. Arbitrator Gorman is, however, now apparently available on May 1–2, 6, 8, 19, and 21–23, 2003.

19. The approximate average monthly cost to the affected employees for continuing medical benefits through COBRA is $270 for one person, $521 for two, and $752 for three or more. Under some plans, the cost can run as high as $1,100 per month to cover an employee and his or her family.

20. Notwithstanding the severance/layoff allowances, many of the laid-off employees stand to lose their medical benefits entirely if the defendant ceases to pay for them as they cannot afford to pay the costs to continue their health insurance coverage under COBRA.

### Discussion

■ We have jurisdiction over this matter pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), (c), which concerns suits by and against labor organizations. That jurisdiction is however somewhat circumscribed by the provisions of the Norris–LaGuardia Act, 29 U.S.C. § 101, which limits our ability to issue injunctions in cases involving labor disputes. Indeed, that section states:

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

This is because the overriding purpose of labor law is to allow the parties, to the extent possible, to settle their own disputes in accordance with their contractual agreements. *Allegheny University Medical Practices v. Sidney Hillman Medical Center*, Civ. A. No. 98–2414, 1998 WL 255545 (E.D.Pa. May 19, 1998), quoting *United Telegraph Workers v. Western Union Corp.*, 771 F.2d 699, 704 (3d Cir.1985).

■ Nevertheless, the Supreme Court has recognized a narrow exception when the issuance of an injunction is necessary to force the parties to comply with a mandatory arbitration clause in the collective bargaining agreement. *See: Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In determining whether such an injunction may issue, the Court must apply a three-part test and consider: (1) whether the underlying dispute is subject to mandatory arbitration; (2) whether the employer, rather than seeking arbitration of the grievance, is interfering with and frustrating the arbitral processes which the parties had chosen; and (3) whether an injunction would be appropriate applying traditional principles of equity. *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 (3d Cir.1985); *Local 1069 v. Boeing Helicopters*, Civ. A. No. 98–4113, 1998 WL 792173 (E.D.Pa. Nov.13, 1998). *See Also: Buffalo Forge Co. v. United*

*Steel Workers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

■ In applying this three-part test to the matter now before us, the parties agree that the underlying dispute concerning the propriety of the layoffs is subject to the arbitration provisions in the collective bargaining agreement. Accordingly, the first requirement to procuring a *Boys Markets* injunction is satisfied here.

We next examine whether the defendants have interfered with or frustrated the arbitral processes. Here, while the record reflects that the defendants occasioned some delay in first refusing to act on the strike-list submitted to it and in rejecting the chosen arbitrator's proposed March and April dates, there is also evidence that the plaintiff's actions in refusing to accept the defendants' proposed arbitrators and January, 2003 hearing dates and in agreeing to defer the arbitration hearings until October, 2003 delayed the proceedings as well. We therefore cannot find that the employer here is interfering with and frustrating the arbitral process.

Plaintiff must also prove the traditional requirements for injunctive relief-probability of success on the merits, irreparable injury, unavailability of an adequate remedy at law, that a grant of an injunction serves the public interest, and that a balance of hardships would support an order enjoining the termination of medical benefits. *See, Local 1069 v. Boeing,* 1998 WL 792173 at *3.

Demonstrating a probability of success on the merits is not an onerous burden in the context of a *Boys Markets* injunction. Indeed, the Third Circuit has held that the union need only show that the position it takes is sufficiently sound to prevent the arbitration from being a futile endeavor, as to hold the union to a stricter standard of proof would intrude significantly on the arbitrator's function and result in the type of judicial preemption of the arbitral process condemned by the Supreme Court. *Sky Vue Terrace,* 759 F.2d at 1098; *IUE–CWA, Local 628 v. Flowserve Corporation of Pennsylvania,* 239 F.Supp.2d 527, 531 (M.D.Pa.2003). Here we find that the plaintiff has presented sufficient evidence that the company has retained contract workers in lieu of its own employees and that there is indeed an issue as to whether the layoffs were precipitated by an "external event" to satisfy its burden of showing that the arbitration would not be a futile endeavor. Thus, Plaintiff has succeeded in showing likelihood of success on the merits.

■ In order to constitute irreparable harm, an injury must be so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party. It would render the award an empty victory. *Flowserve,* 239 F.Supp.2d at 532. Thus, if it appears that the nature of the dispute is such that it would be impossible for the arbitrator to award an adequate remedy without injunctive relief, the court may properly issue a preliminary injunction staying the proceedings until completion of the arbitration. *Philadelphia Joint Board Amalgamated Clothing and Textile Workers Union v. After Six, Inc.,* Civ. A. No. 92–4294, 1992 WL 202170, *7–8 (E.D.Pa. August 6, 1992). Where, however, it appears that an award of money damages would be sufficient to compensate the petitioning party for the irreparable harm to be suffered at the hands of the respondent (i.e., an adequate remedy at law exists), the court must deny the motion for injunctive relief. *Id.*

Here, we note that the collective bargaining agreement, as amended by the Memorandum of Understanding and the Merger Agreement, provides for the full reimbursement to the affected employees of any out-of-pocket medical expenses and/or health insurance premiums which

they may incur in the event that the arbitrator should find that their lay-offs were in breach of the CBA. We therefore conclude that an adequate legal remedy exists in this case and that while the plaintiff has shown that many of its affected workers would undoubtedly suffer hardship were an injunction not granted, it has not shown that that harm would be irreparable.[1]

Finally, we note that neither of the parties offered any evidence that would reflect whether the balance of harm favors one side or the other or whether the public interest would best be served by the issuance of an injunction. However, in light of our findings as outlined above, even assuming that the balance of harm weighs in favor of the plaintiff and that the public interest would best be served by the issuance of an injunction, we are nevertheless constrained to deny the plaintiff's motion.

### Conclusions of Law

1. This Court has jurisdiction over the parties and the subject matter of this case pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, et. seq.

2. The underlying dispute in this issue, the propriety of the December 12 and December 19, 2002 layoffs of 249 members of Local 13000 by Defendants is subject to arbitration in accordance with Articles 10 and 13 of the Collective Bargaining Agreement, as amended.

3. None of the employees who were laid off were members of Local 13500 in Pennsylvania or Locals 13100 and 13101 in Delaware. Those Locals have therefore been dismissed as plaintiffs from this action.

4. The defendants are not interfering with or frustrating the arbitral processes in this case.

5. The plaintiff has sufficiently demonstrated a likelihood that they will succeed on the merits at arbitration.

6. The plaintiff has not shown that its members will suffer irreparable harm in the event that an injunction does not issue pending the conclusion of the arbitration of the underlying dispute in this matter.

7. An adequate remedy exists at law to compensate the plaintiff's members should an injunction be denied under the "make whole" provisions of the collective bargaining agreement and its amending documents.

8. This Court is unable to grant Plaintiff's Motion for Injunctive Relief under the law as set forth in the Norris–LaGuardia Act, 29 U.S.C. § 101, et. seq. and *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) and its progeny.

### ORDER

AND NOW, this 31st day of March, 2003, upon consideration of Plaintiff's Motion for Preliminary Injunction and following hearing in this matter on March 21, 2003 and the evidence presented at that time, it is hereby ORDERED that the Motion is DENIED for the reasons more particularly set forth in the preceding Memorandum Decision.

---

**1.** We note further that while it does not have the obligation to assist its members, the union in this case does appear to have the resources to provide low or no-interest loans or other financial assistance to enable those members who are unable to pay for the temporary continuation of their medical benefits to do so pending the outcome of the arbitration in this matter. It further appears that the union does have certain funds earmarked for member financial assistance in the event of strikes or similar occurrences.