EDITH BROWN CLEMENT, Circuit Judge,
dissenting in part:
This case provides six examples of why companies struggle to remain competitive and efficient when they are unable to enforce basic rules of the workplace under the fear of being sued for labor violations. Because I do not believe El Paso Electric (“EPE”) “effect[ed] a unilateral change of an existing term or condition of employment” with respect to any of the six challenged determinations of the NLRB, I respectfully dissent.
1. Break Time Policy
If a supervisor suggests, but does not require, that a group of employees do then-jobs differently, and there are no direct consequences when those employees decide to simply ignore the suggestion after a short period of time, has the employer unilaterally changed a condition of the employees’ employment? Unlike the conclusion reached by the majority, I think not. A request or suggestion that is ignored without repercussions is not a policy change and therefore EPE did not violate the NLRA by requesting the employees stop aggregating their breaks at the end of the workday.
According to veteran meter reader Cesar Camacho, firsthand testimony credited by the ALJ, the meter reader supervisor’s request that meter readers no longer aggregate their 30-minute lunch and two 15-minute breaks was “not required” but was “kind of enforced, like.” Camacho’s testimony was supported by the testimony of meter reader Galindo, who said that the supervisor’s request to stop aggregating *671 breaks was not mandatory.[1] This is borne out by the actions of the meter readers following the request. While they altered their routine for a while and changed when they took their breaks, Camacho testified the idea “kind of died out.” Without asking if it was permitted, and notably, without being disciplined for not complying with the allegedly changed policy, the meter readers collectively chose to return to their prior practice of aggregating their breaks at the end of the day.
Despite the majority’s statement that this alleged policy change “was identical to the change identified by the Board” found to be a violation of the NLRA in Garrison Valley Center, Inc., 246 N.L.R.B. 700 (1979), the situation here is not “identical.” While the general conceptual issue may be similar — whether employees could aggregate their lunch and two break times — the ALJ in Garrison Valley found “[t]he housekeeping personnel were required to take a 30 minute lunch and two 15-minute breaks.” Id. at 709 (emphasis added). Not so here, where two of the meter readers testified that the change was not required and further supported by the fact that the meter readers were ultimately able to ignore the suggestion without repercussions. EPE, or any other employer, has not unilaterally changed an existing condition of employment simply because a supervisor makes a suggestion or recommendation to a group of employees who choose to follow the recommendation for a short period of time but face no consequences or disciplinary action when they later choose to ignore the recommendation. Stated in terms of the evidence, a supervisor’s request that is “not required” and is “kind of enforced, like” is not a policy change that subjects an employer to NLRA liability.
2. Termination of Navarro
The majority’s conclusion that Mario Navarro’s termination was a violation of the NLRA is primarily based on precedent that, because EPE acknowledged that Navarro was terminated in part because he violated the allegedly changed break time policy by aggregating his break time at the end of the day, the termination was improper. This would be a valid conclusion under the cited precedent if EPE had unilaterally changed the break time policy. However, EPE also fired him for other policy violations only briefly mentioned by the majority — using his work vehicle for personal business without approval and turning on the power at his new residence without specific authorization to energize the electric meter. Because there was no unilateral policy change with respect to the break time policy as discussed above, EPE’s termination of meter reader Navarro was not a violation of the NLRA in light of the other evidence of his policy violations.
The ALJ did not discredit supervisor Gonzalez’s testimony that Navarro took a company truck to attend to personal matters at his new residence and Gonzalez also testified that “it was not uncommon for him to authorize meter readers to take a company truck during the day for any number of personal reasons.” Unfortunately for Navarro, he never asked for authorization to use his EPE truck for personal reasons — something other meter readers asked for and received authorization to do. There was no contention that *672 this requirement to ask for permission to use a company truck for personal business was a new or unilaterally changed policy.
Additionally, it was undisputed that Navarro was not authorized to reconnect electric service at his new residence. Instead, the General Counsel argued that because the primary reason for the rule against unauthorized reconnections is to prevent theft and because Navarro had put in an order to reconnect service, there was no theft concern and his actions were thus a non-issue. Yet the testimony established that another employee had been assigned to turn on the electricity at the house and when she arrived to perform the reconnection, she discovered that Navarro had cut the seal, removed the boots from the meter, and re-energized the meter. Navarro had not replaced the seal meter as required when a reconnection is performed. Whether theft is the basis for the rule against unauthorized reconnections or not, the fact remains that Navarro performed an unauthorized connection, an infraction for which EPE has fired other employees in the past. Employers should not be required to live in fear of labor violation suits for enforcing basic common sense policies such as “do not take a company truck without asking” and “do not turn on electric service for yourself without approval.”
3. Disciplinary Procedures
Showing up for your job on time— whether your “job” is going to school as a young person, working as an hourly employee at a factory, or traveling halfway around the world to attend an important meeting as a senior corporate executive— is a basic requirement everyone should learn early in life. When you do not show up on time, you learn that there may be consequences for being tardy, some expected and perhaps some not expected— having to stay late to make up the time, being required to allocate some of your paid time off to make up for the time you were late, being reprimanded, and possibly even being expelled or terminated if you are continually tardy.
The General Counsel argued that this basic requirement, and the potential consequences that go with it, apparently did not apply to EPE call center employees who were continually late to work. When EPE’s call center supervisor had the temerity to give certain CSRs written notice, in the form of performance improvement plans (“PIPs”), that their continued tardiness could subject them to discipline if they did not improve, the employees’ response was not to follow the rules and show up for work in a timely manner such that they could serve customers in their jobs answering phone calls from EPE customers. Instead, they filed a labor grievance.
While the Board found that (1) the PIPs issued to the continually tardy employees “were part of an disciplinary scheme that could lead to adverse action,” (2) the PIPs “essentially placed employees on probation,” and (3) there was no prior record of EPE placing CSRs on probation or being disciplined for excessive tardiness, none of these are supported by substantial evidence.
None of the CSRs that received a PIP was given an actual written reprimand or placed on actual, as opposed to the Board’s hypothetical “essential,” probation. Each of the six CSRs issued a PIP had already received verbal and written counseling during their annual performance evaluations in which they had scored below expectations for schedule adherence, a euphemism for being on time. Therefore the issuance of PIPs, even if construed as written warnings about tardiness, comported with EPE’s customary disciplinary policy *673 that has always included the ability of a manager to provide a written warning to employees when verbal counseling or warnings were not sufficient to correct a CSR’s performance.
The use of PIPs was also not necessarily new. While EPE had not regularly used PIPs before Carrasco issued them to the six CSRs, EPE had previously used a “Work Development Plan” as early as 2002 for a call center team leader and a PIP for an employee no longer employed by EPE. Confusingly, while the majority asserts that the Work Development Plan was not given because the supervisor “was absent or tardy,” the majority acknowledges that one of the five issues addressed in the Plan was that the supervisor was “unavailable during the work day as his job description required.” Perhaps it is a matter of semantics, but if an employee is “unavailable,” then he is “absent” from his job. This is particularly true in jobs such as these in a customer service call center — if call center employees are not there to answer the phones when customers call seeking assistance, EPE’s business is harmed because customers either cannot reach a representative or the customers must wait in longer hold queues until one of the representatives who is at work when he is supposed to be can answer the calls.
Furthermore, the Board’s finding that the PIPs “essentially” placed the employees on probation is not supported by the facts. While six CSRs received the PIPs, none of the six were actually disciplined such that their pay, hours, or terms and conditions of their jobs as CSRs were impacted, nor did any of the PIPs result in any further actual disciplinary actions. While the General Counsel argued it is “difficult to comprehend how placing employees on probation for several months, with the looming threat of discipline including termination, does not constitute disciplinary action,” there is no evidence, aside from the employees’ statements of their hurt feelings when told they must be at work on time, to support the finding that the CSRs were either essentially or actually on “probation.” Regardless of whether the CSRs received a PIP or not, each employee was always confronted with a “looming threat of discipline” for failing to be on time for work, much like employees in every job. Accordingly, there was not substantial evidence to support the Board’s finding that the PIPs were a unilaterally imposed more onerous disciplinary policy.
4. Co-Workers’ Accounts
There is no dispute that CSRs were provided a written policy that states: “Do not work on personal account, relatives or friends” and the Board credited the testimony of seven CSRs that they understood this policy. And for good reason — the CSRs had the ability to adjust customer billing accounts and there is an inherent danger in allowing a CSR to tinker with the electric bills of friends or relatives. It is unclear whether CSRs were explicitly told they were prohibited from working on co-workers’ accounts. One CSR testified that she was aware that working on coworkers’ accounts was forbidden and call center supervisor Carrasco testified that the policy existed but was not written down. Independent of whether this rule was written down however, common sense rules tell us that friends and co-workers are not mutually exclusive groups. Just because you work with someone does not mean that person cannot also be your friend.
If the evidence consisted solely of the testimony that there was no written policy prohibiting CSRs from working on coworkers’ accounts and Carrasco’s undocumented claim that she had given warnings *674 for such actions, perhaps the Board’s finding would be supported by substantial evidence. However, that is not the case here. There was testimony that the three coworkers were not just co-workers, but also friends both inside and outside the workplace. When they were disciplined for working on each other’s accounts, the employees were being disciplined for a violation of the policy pursuant to the explicit undisputed written terms. Whether the employees admitted that they knew about an explicit rule against working on coworkers accounts or not, there was evidence they at least understood the possible consequences of the common sense rule that a co-worker can also be a friend, as there was evidence that the CSRs attempted to cover their tracks after working on each others’ accounts.
The majority’s reliance on the Board’s crediting of the employees’ testimony that the alleged co-worker prohibition policy was not orally presented during training sidesteps the employees’ violation of the written policy, just as the Board attempted to circumvent this clear violation by noting that the disciplinary letters issued to the three CSRs failed to explicitly list “working on a friends [sic] account” as a violation. The disciplinary letters correctly and succinctly stated that the CSRs had violated company policy: “The Company determined you violated Company and departmental policies.” Though terse, the statement is true. The fact of the matter was that there was a written policy, the CSRs violated it, and they were disciplined. EPE did not violate the NLRA because there is not substantial evidence that the CSRs were disciplined as a result of a unilateral change in EPE’s policy but instead were disciplined simply for violating EPE’s existing written policy.
5. Chelmont Facility Closing
The Board determined that EPE “refused to bargain over any of the effects of closing Chelmont” and therefore violated the NLRA. However, in support of its conclusion, the Board simply concluded, with no citation to record evidence, that EPE labor relations specialist Manuel Hernandez “refused to discuss the issues [involving the closure].” Instead, the Board’s decision appears to mistake several of Hernandez’s comments to union representative Felipe Salazar regarding EPE’s business decision to close Chel-mont — stating that the decision to close the facility was not up for discussion — as a refusal to bargain, which is not part of this appeal, when the actual issue is whether EPE refused to bargain over the effects of the closure.[2]
A review of the record paints a far different picture than the Board’s unsupported conclusion that EPE refused to *675 bargain over the effects of the closure. The record reflects that Hernandez spoke with Salazar multiple times to discuss the union’s and specific member’s concerns in order to address the effects of the closure. Despite the majority’s assertion that “Salazar complained to Hernandez, but no changes were made to the effects of the closure as a result of the complaints,” the majority acknowledges in a later footnote that complained-of issues regarding the effects of the closure and resulting job transfers on employees’ vacation “were satisfactorily resolved to allow the employees to take their scheduled vacations” and the “three employees who had expressed some concerns over their respective transfers were ultimately satisfied with the transfers.” It is unclear how, if EPE was in fact refusing to bargain over the effects of the Chelmont closure as concluded by the Board and the majority, these complaints were satisfactorily resolved.
And, while the union did not get everything it wanted, such as the union’s request that the transferred CSRs receive three months of training, Hernandez and EPE accommodated Salazar’s and the concerned employees’ concerns to the best of their abilities, including three weeks of call center training. Given the standard articulated in First National Maintenance Corp. v. NLRB, 452 U.S. 666, 678 n. 17, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), EPE did not have to agree to the union proposal but only needed to “in good faith consider any proposals the union advances.” The testimony indicated that EPE did consider the union’s training proposal by determining that the three-month training period given to brand new EPE employees was not required for the Chel-mont employees being transferred to the call center because the transferred employees already had significant experience handling EPE customer service issues in their roles as customer service representatives at the Chelmont facility.
EPE’s willingness to negotiate is even acknowledged in the General Counsel’s brief before this court, noting that “Hernandez agreed to look into” the issues raised about the transferred employees’ vacations — issues that, according to Salazar’s own testimony, were ultimately resolved to the employees’ satisfaction. Other issues, such as two employees’ concerns about seniority as a result of the transfers, cannot be held against EPE because the employees themselves told Salazar that they decided to “acquiesce in EPE’s decision.” Respondent’s Brief at 17. Given the employees’ acquiescence, it is unclear how Hernandez was expected to “consider[] changing the transfers after complaints were made” as stated by the majority. Furthermore, when given the chance to submit objections about the proposed transfers on behalf of the affected CSRs, Salazar never called Hernandez. In summary, it is not clear how EPE’s willingness to look into employees’ concerns, employees voluntarily choosing to go along with proposed changes, and the union representative’s failure to raise timely objections regarding the effects of the Chelmont closure can be termed a “refusal to bargain” on EPE’s part. The evidence therefore does not support a conclusion that EPE refused to bargain over the effects of closing Chelmont.
6. Boot Replacement Policy
The Board’s finding and the General Counsel’s argument that “for the first time [Supervisor Debbie Duran] was requiring employees to demonstrate the need for new boots,” thus constituting an improper unilateral policy change, is not supported by substantial evidence. Janet Hallsted, the meter reader whose testimony was cited in support of the NLRA violation, *676 acknowledged she had received a policy statement from Duran that stated all equipment replacements had to be preap-proved by management. Additionally, Duran testified that she has always required a visual inspection of meter readers’ boots before authorizing replacement “ever since we issued boots.”
Instead, the only “change” in policy was that she needed to post a message on the dry erase board due to an unusual phone call by one meter reader asking if all meter readers could get new boots on a specific day in August 2006. It is undisputed that this was a unique event to the extent that Duran had not previously received such a group request to replace all meter readers’ boots on a specific day. There is also no dispute that Duran had not previously posted a message to remind the meter readers to come see her to get approval for boot replacements. But the reason she had never needed to post such a message is because she had never received a phone call requesting all meter readers’ boots be replaced on a single day. Posting the message reminding meter readers to follow what was an existing policy in response to an unexpected group request is not a “change” of policy that supports an NLRA violation.
Nonetheless, the General Counsel attempts to portray Duran’s message as a distinct change of policy by referencing an email message that was allegedly sent by field analyst Art Sanchez to all meter readers twice a year reminding them to get new boots. Despite claiming that “[s]ubstantial evidence supports the Board’s finding that, in practice,” employees would get reimbursed for boots if they turned in receipts after Sanchez’s email, the General Counsel provides no other support for either the Board’s finding or the argument in its brief. Nor does the General Counsel make any connection between the sending of this alleged email by field analyst Sanchez to any policy or course of action by supervisor Duran with respect to boot reimbursement — it is not even clear whether Sanchez is a member of the union or part of EPE management, or that he had any authority regarding boot reimbursement. Given the existing policy that equipment replacements needed to be preapproved by management, there is little basis for why a field analyst would send what the General Counsel attempts to portray as a blanket approval for everyone to buy new boots. In fact, the evidence contradicts such a conclusion, as EPE was able to produce a detailed spreadsheet documenting not only when each meter reader received new boots but also specific details about the every employee’s boots, such as the brand and style of each pair of boots.
While the majority minimizes the existence of this spreadsheet by pointing out that the spreadsheet does not indicate the condition of the old boots and therefore calls into question whether Duran inspected employees’ boots before reimbursing the purchase of new boots, the fact remains that if she had only received receipts for boot purchases without visually inspecting the meter readers’ boots, it is unlikely she would have been able to collect this detailed data. Furthermore, Duran was able to visually identify the boots worn by the meter readers when she saw them during the work day, as evidenced by the testimony recounting several exchanges with meter readers after she saw them wearing boots that were older than or different from the boots for which she had paid reimbursement.
Additionally, the majority finds a unilateral policy change because “meter readers would have to change their practice of simply submitting receipts.” However, the meter readers apparently had always *677 been required to do more than simply submit a receipt to get reimbursement for new boots as evidenced by the boot replacement spreadsheet, which could only have been developed by either speaking with Duran or showing her the new boots so she could record the details of the brand and style of the boots. If such a minor inconvenience or change to operating procedure results in a labor violation as a change in “terms and conditions of employment” in light of the fact that there was no evidence that Duran actually denied any specific employee’s request for new boots, employers effectively have no control over how to manage their day-today business operations. This is particularly evident, given the standard in In re McClatchy Newspapers, 339 NLRB 1214 (2003), where, as here there was no testimony that any employee was actually, as opposed to “effectively” or possibly, affected by the allegedly changed policy.
[T]he change in payroll caused no reduction of work hours and seemed to be “purely for internal bookkeeping purposes.” The General Counsel presented no evidence that the change affected employees after it was put in place. For these reasons, we cannot find that a “material, substantial, and significant” change in a term of employment occurred in this instance.
Id. at 1215-16 (citing Peerless Food Products, 236 NLRB 161 (1978)). That is, even without any evidence of actual harm or effect, the majority endorses a finding that requiring meter readers to show their boots before being reimbursed is a material, substantial, or significant change in employment. Because there is not substantial evidence to support such a conclusion and, even if Duran’s message could somehow be construed as a policy change, the lack of evidence of any effect precludes a finding that EPE violated the NLRA.
Conclusion
We are far removed from the era in which unions were the necessary, staunch defenders of employee rights in the face of abusive, domineering, and exploitive employers. Where unions once protected employees from dangerous working conditions and unfair treatment, EPE is being held liable for labor “violations” including: asking, but not requiring, employees to take their breaks at the logically intended times; warning excessively tardy employees that they might be subject to discipline if they do not start showing up on time; asking to see employees’ boots before paying to replace them; firing an employee who took a company vehicle on personal business without approval and improperly connected his own electric service; “refusing to bargain” despite trying to address employees’ concerns when closing a facility; and disciplining employees for violating a published company policy. In lieu of common sense and attempting to abide by the basic rules of the workplace we all learn as young people in school or in a first job, employees and companies now resort to allegations of and defenses to labor violations, respectively. Companies are then overly constrained by the subsequent findings of liability that regulate workplace interactions and limit the ability of companies to manage basic day-to-day business operations. With respect to the majority’s conclusions on the six challenged labor violations, I respectfully dissent.

. Although the ALJ did not credit Galindo's testimony, Galindo was not the only person other than Camacho to testify that the employees were not required to change when they took their breaks. Two meter reader supervisors, Greg Gonzalez and John Robi-nette both testified that meter readers could always take their breaks whenever they chose and the meter readers were never prohibited from aggregating their lunch and break times.

. The majority's attempt to paint EPE’s communications in a negative light by pointing out that the union was “only given seventeen minutes notice about the closure of the facility and a few hours notice about the transfers before the employees were informed” is similarly immaterial to this appeal. The Board remanded the question of whether the decision to close the facility was subject to bargaining and therefore it is undetermined whether the union was entitled to any advance warning with respect to that decision. With respect to the transfers, the relevant time period for bargaining with respect to the transfers as an effect of the decision to close Chelmont is not the few hours before the employees were informed because the decision to close the facility and the need to transfer the employees is effectively one and the same. That is, EPE could not decide to close the facility without offering a simultaneous proposed course of action with respect to the employees of the Chelmont facility. Instead, the relevant time period for bargaining was the intervening month between the announcement and the closure, which is exactly when Hernandez and Salazar spolce multiple times.